HIGGINS, Justice.
 

 Plaintiffs as owners of the fee simple title of 456 acres of land located in the Sugar Creek Oil Field in Claiborne Parish, Louisiana, instituted this suit for the purpose of having annulled and cancelled a pooling or unitization agreement and division order dated December 31, 1931, various royalty and mineral interests, and certain mineral leases dated January 9, 1929
 
 *872
 
 and February 25, 1930, covering mineral rights in the property in question.
 

 The grounds upon which the contract of December 31, 1931 is sought to be set aside are that it was obtained through error, misrepresentation and fraud, and, in the alternative, that it was not supported by any legal or valid consideration.
 

 ■The mineral and royalty interests of several .claimants are alleged to have been lost by prescription of ten years, liberandi causa; that the interests of another group of royalty and mineral owners lapsed because the sales thereof were limited to the terms of certain mineral leases, which expired for failure to produce oil or gas during their primary terms; that certain royalty and mineral interests were null and void, because the description of the property was so vague that its identification was impossible; and that other claimants of mineral and royalty interests lost their rights because they were acquired under sales which subjected them to the leases of the Triangle Drilling Company, which are under attack in the present suit.
 

 The leases are said to have passed out of legal existence because: The lessees failed to pay the lessors (plaintiffs) the oil royalties due them; diverted plaintiffs royalties to adverse mineral claimants; failed to produce oil and gas in paying quantities; and failed to comply with their implied obligations to reasonably and further develop the leased premises.
 

 The petitioners, in their original and supplemental petitions, reserved the lessees’ rights to legally operate the present oil producing well as long as royalties were duly paid them. Petitioners further allege, in the alternative, if the lessees were given more time to comply with the leases, that the court order them to drill one well to a depth of at least 5,000 feet on each 40 acres of the tract of land.
 

 The defendants denied the alleged error or fraud in reference to the unitization agreement and division order and that the contract was invalid for want of proper consideration, and averred that it was supported by valid consideration and the advantages obtained by plaintiffs, and that, even if the mineral and royalty claims be held to have prescribed, that these prescribed rights were natural obligations and, therefore, sufficient consideration to maintain the contract.
 

 The defendants denied that prescription had run against any of the mineral and the royalty rights, and, in the alternative, pleaded interruption of prescription by drilling operations on the property, renunciation of prescription by a written contract, and estoppel. The defendants denied that other mineral and royalty interests lapsed with certain leases, averring that the expiration of the leases did not cause a legal cessation of the rights of these royalty and mineral owners.
 

 The defendants further denied that the description of the property affecting certain mineral and royalty interests was fatally defective and averred that the grants were valid and if there was any failure in the deed, it was only of that part of the description with reference to a reservation of certain land in favor of the plaintiffs.
 

 
 *874
 
 Defendants averred that the plaintiffs peremptorily refused to accept the oil royalties due them when tendered by the lessees. They denied that there was a diversion of the royalty to other parties and that they had failed to produce oil and gas in paying quantities and had not reasonably developed the leased premises.
 

 Some of the mineral and royalty owners filed exceptions of no right and no cause of action on the ground that they had purchased their rights in good faith on the public records and, therefore, their rights were not subject to equities between the original parties. The exceptions were sustained by the district court and thereafter these defendants did not further participate in the trial of the case on its merits.
 

 Plaintiffs moved for .judgment on the face of the pleadings, which was denied, and, on the trial of the case on the merits, their suit was dismissed, and they appealed.
 

 The record shows that Warren Brown was the fee simple owner of 456 acres of land located in Claiborne Parish, Louisiana. On May 9, 1919, he executed a royalty sale to L. M. Tooke and J. E. Reynolds of an undivided
 
 y2
 
 of the % royalty which he (Warren Brown) reserved in a lease given to Fuller and Carnahan. It was expressly agreed that the grantee was only purchasing one-half of whatever royalty might be collected under the lease. In passing we might say that as this lease had lapsed and the royalty was specifically limited to it, the royalty grant likewise expired with the lease. Calcasieu Oil Company, Inc., v. YountLee Oil Company et al., 174 La. 547, 141 So. 55. None of the defendants are claiming through this conveyance.
 

 On July 22, 1921, Warren Brown sold to L. M. Tooke “ * * * an undivided one-half interest in the one-eighth royalty in and under the .following land, containing three hundred (300) acres more or less, * * *The land was described as located in Section 35, but as Brown did not own any property there, the correct Section was 36. One hundred acres out of the NE corner (being the SE% and the SE14 of SWy4, Section 35) were reserved to grantor.
 

 It was expressly stipulated in the act that “ * * * It is the intention of the vendor herein to sell to the vendee an equal one-half of the one-eighth royalty in and to all oil, gas, and minerals in and under the above described three hundred (300) acres of land.”
 

 As the royalty interest in this deed is not limited by the terms of any lease it is, therefore, clearly a sale of
 
 y2
 
 of the % royalty in the property described.
 

 It is apparent that it was a mere error to describe the land as being situated in Section 35, instead of Section 36, because Warren Brown did not own any property-in the former section.
 

 On October 23, 1923, Warren Brown sold to G. L. Shields
 
 y2
 
 of the oil, gas and other minerals in and under and that might be produced from the East half of the SE1/^, Section 36, Township 20 N, R 6 West, containing 80 acres, more or less. It was stipulated that the sale was made
 
 *876
 
 “* * * with the understanding that the above land is unleased * * *, covers and includes one-half mineral rights. * * * ” There never was any well drilled upon the above described 80 acres and Shields’ interest therein passed by mesne conveyance to the defendant E. L. Norton, who purchased it on September 1, 1937.
 

 On February 18, 1924, Warren Brown and his children (his wife having died in the meantime, and her seven children inheriting their mother’s % community interest in the property), together with the North Central Texas Oil Company, then assignee of Shields, executed a mineral lease to R. H. Brothers and John Woodley, covering the entire property.
 

 On April 8, 1924, Warren Brown sold to L. M. Moffitt for $420, a % interest in the oil, gas, and other minerals in all of the 456 acres involved, “ * * * subj ect to an oil and gas lease executed in favor of R. H. Brothers and John Woodley, recorded on the - day of -, 1924, and recorded in the Records of Claiborne Parish, Louisiana, made part hereof by reference; but covers and includes
 
 Ya
 
 of all of the oil royalties and gas rentals and royalties due and to become due under the terms, of the said lease, and no interest in any money rentals that may be hereafter paid in order to keep said lease in effect without drilling.”
 

 After the description of the property, the following sentence appears in the sale: «* * * it being understood that the assignee, his heirs and assigns, do not participate in any lease or money derived from the sale of any lease that hereafter (might) may be made.”
 

 On February 24, 1925, plaintiffs sold an undivided % of the minerals in 180 acres, a % of the minerals in 80 acres, and a
 
 Ys
 
 of the minerals in 200 acres to S. S. Littlejohn, for a consideration of $1,436.-50. Viola Brown added, after her signature to the salé, that she signed for 300 acres and no more. This sale contained a clause similar to that in the Brown to Moffitt transfer.
 

 The lease to Brothers and1 Woodley dated February 18, 1924, was still legally effective and of record, and had been acquired by the Triangle Drilling Company as assignee, which company prepared to drill a well on the tract in the year 1925. After an investigation, the company’s representatives, having concluded that the interests among the royalty and mineral owners (because of the several sales by the plaintiffs above outlined) were uncertain and conflicting, prepared an.agreement fixing the division of interests, in order to settle these disputes, which contract was entered into on May 29, 1925. The document was only signed by the plaintiff Warren Brown and the interest of each claimant was set forth therein. In the division order, McCullough conveyed to J. W. Atkins and L. M. Tooké an undivided l/64th interest, and to J. E. Reynolds an undivided l/64th interest in the minerals under a certain tract or part of the land. The necessity for this agreement fixing the different interests in the
 
 *878
 
 royalties and minerals under the property was apparent in order to avoid confusion and probable litigation.
 

 After the execution of the agreement of May 29, 1925, the Triangle Drilling Company, as the assignee of the Brothers and Woodley lease of February 18, 1924, which was ratified by the land, the royalty and the mineral owners in the above referred to contract, drilled a well on the property at a cost of approximately $12,-000. This well was abandoned at a depth of 2,604 feet as a dry hole, because salt water was encountered. The defendants contend that the drilling of this well interrupted the prescription which might have accrued against all parties holding under the Tooke purchase in 1921. Plaintiffs reply that .as the drilling was not done in good faith and was not a- bona fide effort to explore the premises for oil and gas, prescription was not thereby interrupted.
 

 It appears that the drilling of this well on the Brown property was one • of the seven tests made by the Triangle Drilling Company in 1925 and 1926,. in what is commonly known as the Sugar Creek territory. The company’s representatives were of the opinion that the area was very promising and drilled these wells with the expectation of uncovering a new field, but were unsuccessful. .
 

 In 1929, the defendant Triangle Drilling Company commenced to reassemble the leases in the Sugar Creek area, and after an examination of the various Brown sales, it appeared that plaintiffs had, in 180 acres in Section 36, by warranty, .deed, sold 3/64ths more in the % royalty than they originally owned if all their transfers were effective. In other words, it was impossible to satisfy the royalty- vendee Tooke and his assignees and the Aiineral vendees, Shields, Moffitt and Little-john, and their assignees, out of the interest that the Browns originally owned, and they were consequently liable on their warranty to their last vendee, Littlejohn or his assignees, if all of plaintiffs’ transfers were still legally alive.
 

 On January 9, 1929, a lease was executed wherein “Warren Brown and the undersigned mineral owners * * * ” leased to the Triangle Drilling Company the 456 acre tract involved here for a primary term of five years. This lease was properly recorded. On its face, it appears to have' been signed by Warren Brown, his son Crawford Brown, his daughters, Mary L. Bailey, Ethel Brown Sapp, and Leola Walker, and most of the other mineral and. royalty owners who are defendants here. The three children of Warren Brown who had not executed the lease, made a co-lessors’ agreement dated February 25, 1930, wherein they acknowledged the lease as well as all of its terms and conditions and stated:
 

 “ * * * it being the intention that this instrument shall express full concurrence as co-lessors, in said lease and shall have the same effect as signing our name to said oil and gas lease as co-lessors at the time of its execution.
 

 “It is further understood that, in addition to our proportion of the down payment recited in said oil and gas lease, re
 
 *880
 
 ceipt of which is hereby acknowledged, rentals and royalties provided in said lease in so far as the land designated herein as land in which we own an interest in the minerals is concerned, shall be payable to us
 
 in the proportion our interest in the minerals bears to the whole of the minerals in and under such designated land.”
 
 (Italics ours.)
 

 The Triangle Drilling Company then secured the ratification of its leases by the other mineral and royalty owners who had not previously signed the document.
 

 In August 1930, the Browns executed and recorded a notice warning the public not to deal with any parties who claimed any interests under the royalty sale of May 9, 1919 to L. .M. Tooke and J. E. Reynolds, the subsequent agreement with either Tooke or Reynolds of July 22, 1921, or with any party who claimed to hold under the above sale of October 23, 1923 to G. L. Shields, and notifying the public that the rights of those holding under these sales were null and void.
 

 The leases of January 9, 1929, and February 25, 1930, were kept alive by the lessees through the timely payment of $456 each year to defer drilling as provided by the leases. In 1931 the lessee Triangle Drilling Company, preparatory to drilling on the property again in an effort to obtain oil and 'gas in paying quantities, took note of the conflicting mineral interests and errors which had appeared in the royalty and the mineral sales above mentioned and which had been the subject of attention of the same lessee when it held the property in 1924 and drilled the well thereon in 1925, and caused the title of the land to be examined and a pooling agreement and division Order prepared. In this document the leases were expressly unitized and each royalty and mineral owner agreed to take that portion of the royalties that his interest bore to the 456 acres in the proportion and percentage set forth in Schedule
 
 “A”
 
 attached thereto. This contract, dated December 31, 1931, was signed by all of the royalty, the mineral and the land owners, the plaintiffs herein. The document was recorded on February 29, 1932.
 

 In the first paragraph of the agreement it is stated that the “ * * * undersigned are the owners, subject to the leases hereinafter described, of all of the oil, gas and other minerals * * * ” in the 456 acres involved here. It is also stated that the three lessee defendant oil companies are the owners of valid and existing leases on the property. The document further stipulates:
 

 “Now, therefore, it is mutually agreed by and between all the parties hereto as follows:
 

 “First: The oil and gas royalties of the undersigned mineral owners accruing under the above leases have been by the execution of the above leases, pooled, for the life of said leases and no longer, to the same extent as if the said mineral owners were each the owner of an undivided interest in the oil, gas and other minerals in, on and under all of the above described property in the proportion which the interest of each of the undersigned mineral owners bears to the whole and undivided mineral estate in and to all of
 
 *882
 
 the above described property, and the undersigned mineral owners are the owners of all of the royalties provided for in said leases as to the above described property in the proportions set forth in Schedule ‘A,’
 
 which royalties the lessees áre authorized and requested to distribute
 
 according.
 
 to the division of interest set forth in said Schedule.
 

 “Second: This agreement is executed by the undersigned for and in consideration of the advantages accruing to them by the clarification, at this time, of the provisions of the above leases with reference to the payment of royalties and in consideration of the mutual benefits to be received under the distribution of royalties as herein provided for, and other good and valuable considerations.” (Italics ours.)
 

 The Schedule “A” referred to sets forth the lease executed in 1929, and the co-lessors’ agreement of 1930 and then contains the division of royalties, giving the percentage of royalty for the whole 456 acres, which each party is entitled to receive. The Browns, together, were credited with 12%% of the royalty, i. e., l/8th of the usual l/8th royalty, or l/64th throughout the entire 456 acres. As they had previously alienated all of their mineral rights in the 180 acres of the tract, in order to give them the credit of the 12%% in this 180 acres, it was necessary that this interest be taken from someone else. It appears that J. S. McCullough, who had acquired the Littlejohn interest, was given less than he would otherwise be entitled to if his rights were still in existence. The testimony also confirms the fact that this interest was taken from McCullough and credited to the plaintiffs. The former division of interest prepared in 1925 credited the Browns with a l/64th royalty interest in all of the property in question and the McCullough interest was correspondingly decreased insofar as the 180 acres referred to above were concerned. Thus indicating that in the effort to settle and clarify the division among the royalty and the mineral owners, the previous method of adjustment was again followed.
 

 The record shows that the above result was accomplished in accordance with the written opinion of the attorneys for one of lessees, dated June 30, 1931, wherein the above errors, uncertainties and conflicts in reference to the mineral rights or titles were pointed out and an agreement fixing the division of interest of all of the parties affected was recommended.
 

 After the execution of the contract of December 31, 1931, fixing the division of interest of all parties concerned, the document was recorded, thus vesting in the Browns a title to an undivided l/64th royalty- interest in the entire 456 acres. At that time, the Browns sold to Dr. Claude C. Craighead one-half of the interest allotted them according to the terms of the agreement, or % of their l/64th royalty interest in the entire 456 acre tract, or a l/128th royalty interest, for the sum of $1,500, subject to the mineral leases on the property.
 

 On March 26, 1936,
 
 Warren Brown sold to the Triangle Drilling Company a 1/192 of the oil, gas and other minerals in
 
 the entire 456 acres,
 
 for $100 cash,
 
 subject to
 
 
 *884
 

 the lease of January 9, 1929,.“*
 
 * *
 
 that certain oil and gas lease covering said property, executed by vendor herein, together with other parties, in favor of Triangle Drilling Company, Inc., *
 
 * *
 
 and that certain division order covering said property, executed by vendor herein, together with other parties in favor of Standard Oil Company of Louisiana, United Gas Public Service Company, and Sugar Creek Syndicate, Inc., same being dated December 31, 1931,
 
 * * * the intention of this sale being to convey to said vendee herein the above set forth mineral interest in said property, together with .52086 per cent, of the oil royalties and gas rentals or royalties due and to
 
 become due under the terms of said lease
 
 and division order. * * * ” (Italics ours.)
 

 Subsequent to the execution of the division order and pooling agreement of December 31, 1931, and relying thereon, the defendant .lessees commenced the drilling of a well in the NE}4 of Section 1 of the property involved herein. This well was completed in October, 1932, at a depth of 4,486 feet as a commercial gas well. Thereafter, it was operated for about five years by the defendant lessees under the leases and the pooling agreement and the gas royalties were promptly paid in accordance with the directions therein contained, the plaintiffs receiving their proportionate part of such royalties. No complaint was made by the plaintiffs as to the manner in which the gas well was operated and the amount of royalties paid to them.
 

 In the Spring of 1937, the defendant lessees, after having deepened the Warren Brown, well to 5,746 feet, completed it as a commercial oil well which produced from 35 to 17 barrels of oil per day.
 

 After the completion of the oil well, sometime elapsed before a connection could be made with an oil pipe line (it being necessary to lay the gathering system to the well) and before a verification could be made of the royalty interests as of the date in question. When this was completed, in order to fix a price for the oil and the terms and conditions of its sale, a new division order was prepared by the United Gas Public Service Company, the defendant lessee in charge of the operation of the well, and this division order was circulated among the royalty and mineral owners.
 

 The Browns, after stating that they wanted to consult with each other, re-fused to sign the division order. Counsel for the plaintiffs then, in writing, called upon the defendant lessees to release the leases in question, and when they declined, the present annullment and cancellation action followed.
 

 On the issue of error, misrepresentation and fraud. in obtaining the plaintiffs’ signature to the unitization agreement and division order dated December 31, 1931, the plaintiffs testified' that Schedule “A”, showing the respective proportionate interests of the mineral and the royalty owners, was not attached to and made a part of the contract, when they signed it, but that it was annexed thereafter. They also state that they did not understand the agreement and had no intention of recognizing the alleged prescribed and lapsed rights of the mineral
 
 *886
 
 and the royalty owners. They admit that they received the gas royalty payment checks with statements attached showing the respective interests of those who were entitled to participate in the royalties and that all of these royalty checks from the operation of the gas well were cashed by them and that they did not make any protest or complaint during the period of approximately five years in which they received the payments.
 

 The defendants’ witnesses testified that Schedule “A” was annexed to and made a part of the unitization agreement and division order at the time plaintiffs signed it, and that the contents of all of these documents were read and explained to them or that the plaintiffs read the documents themselves; that Warren Brown, upon receiving these papers, stated that he wished to discuss the matter with his children before signing the agreement; that later, Dr. Claude C. Craighead, who was interested in purchasing some of the plaintiffs’ mineral rights and was negotiating with them at the time, secured plaintiffs’ signatures to the documents, which were registered in the Conveyance Office; that shortly thereafter, the plaintiffs sold Dr. Craighead a l/128th royalty interest in the minerals in the 456 acre tract of land for $1,500, and on March 26, 1936, Warren Brown sold to the Triangle Drilling Company a 1/192 part of his mineral rights in the entire tract of land for $100 cash; that after the gas well began to produce, the plaintiffs received their gas royalty payment checks with statements attached, showing the respective proportionate interests of all of the mineral and royalty owners, and cashed them without complaint, and that this method of handling the matter continued for about five years. They support their testimony with documentary evidence, particularly with the division statements and the deed whereby Warren Brown sold the Triangle Drilling Company a 1/192 interest in the whole tract of land on March 26, 1936, with approval of the leases of January 9, 1929 and February 25, 1930, and recognition of the unitization agreement and division order of December 31, 1931.
 

 Counsel for the plaintiffs argue that their clients are ignorant negro people and that they have been" imposed upon. The evidence shows that Warren Brown was illiterate but that he had had some experience in mineral transactions, and that his children were educated, one of them being a school teacher, whom he specially consulted.
 

 The record does not show any error, misunderstanding or fraud, but, on the contrary, the testimony and the documentary evidence establishes the fact that the plaintiffs were apprised of and familiar with the entire matter and understood the unitization agreement and the division order. This is demonstrated by their conduct during the five year period in which they accepted the royalty payments without protest, complaint, or any action to set aside either the division order or the pooling agreement, and by Warren Brown’s action in selling other royalty interests in the tract with recognition of the recorded documents of December 31, 1931.
 

 
 *888
 
 Was there a valid consideration to support the division order and unitization agreement of December 31, 1931?
 

 Counsel for plaintiffs contend that insofar as the mineral and royalty interests which had been granted by the plaintiffs more than ten years before the execution of the contract of December 31, 1931, were concerned, and the grants of royalty and mineral interests limited to the specific leases and their primary terms, the rights of these respective royalty and mineral owners had prescribed by ten years prescription liberandi causa for non-user or lapsed upon the expiration of the leases. They also argue that the sale of the mineral interest by Warren Brown to L. M. Tooke on July 22, 1921 is null and void because the property was so indefinitely described as to be insusceptible of identification.
 

 It appears from the record that the royalty and mineral owners to whom the plaintiffs had granted their respective rights were claiming their mineral and royalty interests in the land and, therefore, when the Triangle Drilling Company was preparing to assemble the leases for the purpose of drilling again, the attorneys, in examining the title, directed attention to the conflicts, the disputes and the errors in the description of the property, as well as the fact that the plaintiffs had oversold their mineral interests in 180 acres of the land, and pointed out that if all of the claimants were to be recognized, it was necessary that an agreement should be entered into by all of the parties concerned, in order to avoid confusion and disagreement and to establish certainty with reference to the conflicting claims.
 

 It will be remembered that a well had been drilled on the premises to a depth of 2,604 feet by the Triangle Drilling Company in 1925, and according to the testimony, this was a good faith effort to discover oil and gas on the premises. This well was drilled after obtaining the consent and authorization of the land owners (plaintiffs) and the mineral and royalty owners (defendants). The royalty and mineral owners claimed that the drilling of this well interrupted prescription and, therefore, their mineral rights were still in legal existence and not prescribed. They also claimed that their mineral and royalty interests did not lapse with the leases, and that the clause “subject to the lease,” contained in the grants, only meant that their rights were subordinated to the prior recorded leases and not that they were limited to the primary terms of the leases. They said that this clause was placed in the grant to protect the plaintiffs on their warranty.
 

 As further evidence that they did not intend to give up or abandon any of their rights as prescribed or lapsed, the mineral and royalty owners state that they, together with the land owners, signed and approved the leases in favor of the Tri-' angle Drilling Company on January 9, 1929 and February 25, 1930, covering the same tract of land as a whole.
 

 Counter to the plaintiffs’ idea that the entire sale to Tooke was void, it was suggested that the transferee or grantee has the right to have an erroneous description
 
 *890
 
 corrected to conform to the true intention of the parties, and further, that as the uncertainty or vagueness existed only as to the reserved or excepted portion of the property, the reserved or excepted part alone fell and the grant or sale was otherwise valid. Frantom et al. v. Nelson, 142 La. 850, 77 So. 767; Waller v. Colvin et al., 151 La. 765, 92 So. 328; and Harrill et al. v. Pitts et al., 194 La. 123, 193 So. 562.
 

 At the time of the unitization agreement and division order in 1931, the leading cases on the question of what constituted the interruption of prescription on servitudes were Mulhern v. Hayne et al., 171 La. 1003, 132 So. 659, which dealt with the acknowledgment and extension of the mineral right on the part of the land owner, and Keebler et al. v. Seubert et al., 167 La. 901, 120 So. 591, covering the matter of the interruption of prescription by the exploitation of the property. At that time the much debated questions of prescription and interruption of prescription against royalty .interest had not been decided by this Court in Vincent v. Bullock, 192 La. 1, 187 So. 35.
 

 In order to relieve the unquestionably confused state of the respective mineral rights of all the parties, the agreement of December 31, 1931, was entered into by the land, the mineral, and the royalty owners, wherein the interest of each party thereto was definitely fixed. The plaintiffs were granted a l/64th royalty in the 180 acre tract, which they had apparently already oversold, by decreasing th!e interest of other mineral and royalty owners. As we have already stated, Dr. Claude C. Craighead was negotiating to purchase certain- mineral rights from the plaintiffs and only concluded the transaction with reference to an undivided l/128th royalty interest in the entire tract of land after the plaintiffs’ interest had been definitely fixed in the agreement of December 31, 1931, and that document was promptly registered. The same observation may be made with reference to the sale by Warren Brown of the 1/192 royalty in the whole tract in 1936, with full recognition of the pooling agreement and division order of 1931.
 

 The legal consideration which made the contract of December 31, 1931, valid and binding was the surrender of the rights of tjie mineral and royalty owners to have determined by judicial process— first, whether their interests had prescribed or lapsed, and second, to have the court correct the erroneous description of the property to conform to the true intention of the parties, by declaring only the uncertain excepted or reserved part of the description null, and otherwise giving legal effect to the sale or grant. In other words, the mineral and the royalty owners relinquished their rights at that time to have the court resolve the several serious legal problems presented, in order that there might be an amicable settlement and adjustment of the differences between all of the involved parties. Breard v. Pyramid Oil & Gas Company, 191 La. 420, 185 So. 303. Furthermore, it appears from the record that the contract of December 31, 1931 was not only based upon a valid consideration but that the defendants relied
 
 *892
 
 thereon and the plaintiffs accepted and have enjoyed certain benefits therefrom which they still retain. Therefore, they are not only bound by the agreement but under the plea of estoppel they are barred from making any attack on the validity of the instrument. Robbins v. Martin et al., 18 La.App. 223, 138 So. 132; Sam George Fur Company, Inc., v. Arkansas-Louisiana Pipeline Company et al., 177 La. 284, 148 So. 51; Federal Land Bank of New Orleans v. Sanders, La.App., 167 So. 140; English v. Blackman et al., 189 La. 255, 179 So. 306; Mims et al. v. Sample et al., 191 La. 677, 678, 186 So. 66; Burns v. Rivero, 192 La. 767, 189 So. 129; Bell v. Canal Bank & Trust Company, 193 La. 142, 190 So. 359; and, Allardyce v. Abrahams, 190 La. 686, 182 So. 717.
 

 The plea of prescription of ten years .liberandi causa for non-user pleaded by the plaintiffs, against the. mineral and the royalty owners who - acquired their rights prior to December 31, 1931, passed out of the case insofar as the plaintiffs are concerned, because we have already held that the agreement of December 31, 1931 was valid and binding upon them and, as they expressly recognized these mineral and royalty owners’ interests in the land arid extended their rights during the 5 year primary terms of the leases of January 9, 1929 and February 25, 1930, the rights of the mineral and royalty owners were thereby kept in legal existence. Mulhern v. Hayne, 171 La. 1003, 132 So. 659; Superior Oil Producing Co. v. Leckelt, 189 La. 972, 181 So. 462; and Vincent v. Bullock et al., 192 La. 1, 187 So. 35.
 

 The royalty and mineral interests said by plaintiffs to have lapsed by expiration of the primary terms of prior leases, were likewise recognized by -the plaintiffs in the agreement of December 31, 1931, and extended for the primary terms of the leases of January 29, 1929 and February 25, 1930, and thereby continued in legal effect. Cox v. Acme Land & Investment Company, 192 La. 688, 188 So. 742 and R.C.C. art. 1956. The' payment by the lessees of $456 per year to defer drilling operations kept the leases alive until the drilling of the gas well was commenced and after its completion in October 1932, they were kept in existence by the gas royalty payments to the plaintiffs, who accepted them without complaint until 1937, when this suit was instituted. The land, the mineral, and the royalty owners having executed a joint lease and pooling agreement and a division order, and the royalties having been paid in accordance therewith, the mineral and royalty interests did not prescribe as long as such payment continued. Cox v. Acme Land & Investment Company, supra.
 

 The mineral and royalty owners who acquired their rights on the faith of the public records after the December 31, 1931 agreement was registered are obviously protected. Bell v. Canal Bank & Trust Co., supra. Mims et al. v. Sample et al., supra.
 

 Plaintiffs seek the cancellation of the oil and gas leases on the following grounds:
 

 (1) The alleged failure of the defendant lessees to pay plaintiffs, the oil royal-
 
 *894
 
 ties due since the completion of the oil well;
 

 (2) The alleged diversion of the plaintiffs’ royalties to adverse mineral claimants, and, in the alternative;
 

 (3) The alleged failure of the lessees to produce oil, gas and other minerals in paying quantities, and, in the further alternative ;
 

 (4) On the ground that the lessees have failed to comply with their implied obligations to reasonably and further develop the leased premises.
 

 We shall discuss these issues in the above order:
 

 First. The well drilled by the defendant lessees was recompleted in March 1937, as an oil well at a greater depth than it was originally completed as a gas well.
 

 The leases - contain this provision: “ * * * to deliver to the credit of the lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from said leased premises. * * * * ” Therefore, under the terms of the leases, the lessees were required to deliver the lessors’ %th part of the oil into a pipe line to which the well was connected. After fulfilling this requirement, they attempted to have the lessors sign the division order, which had for its purpose the sale of the plaintiffs’ part of the royalty oil, and the lessors refused to sign the instrument. Consequently, no sale of the lessors’ or plaintiffs’ part of the royalty oil was ever effected and no payment was made to plaintiffs, as no price had been fixed by them' for the royalty oil that they owned. They (lessors) made no demand for payment of their royalty either upon the lessees or the pipe line company.
 

 After the plaintiffs complained in this suit that they had not been paid any oil royalty, the lessees undertook to pay them their part of the oil royalty, based upon the price agreed to by the other royalty owners, but the plaintiffs refused to accept the royalty checks sent to them. In the absence of a demand for payment of the royalties and any provision in the leases giving the lessors the right to .cancel the leases for non-payment of royalties, the first ground urged by the plaintiffs must fall. Thornton on Oil and Gas, 5th Ed., Section 304.
 

 Second. Plaintiffs make their second claim in disregard of the agreement entered into between them and the other mineral and royalty owners dated December 31, 1931, and the division order in connection therewith. The basis of this attack is that certain mineral and royalty claimants lost their rights through prescription, the expiration of the primary terms of previous recorded leases, and the faulty descriptions. As we have already concluded that this agreement was not only binding on the plaintiffs but that it also operated as an estoppel against them, the second contention is likewise without merit.
 

 Third. The question of whether or not the well is producing oil and gas in paying quantities requires a consideration of the operation costs and the revenue,
 
 *896
 
 and if a fair and reasonable profit is made, then it is considered a commercial well.
 

 In April 1937, the well was producing thirty-five barrels of oil daily. On June 6, 1938, it was producing from seventeen to nineteen barrels per day, or a net profit of $8 to $10 per day was realized.
 

 The leases provide, in express terms, that they are to last for a period of five years and as long thereafter as oil or gas, or either of them, is produced from the land by the lessees. This means producing oil and gas in paying quantities. Logan v. Tholl Oil Co., 189 La. 645, 180 So. 473.
 

 The original petition asked for the cancellation of the leases but reserved the lessees the right to operate the well provided the royalties were paid. The supplemental petition also excepted the present well on the same conditions.
 

 The gas well, which was brought in in 1932, ceased production in February 1937, when it was converted into an oil well. The gas well had produced more than 993,667,000 cubic feet of gas and more than 969,665 gallons of gasoline. The gas had a gross value of $39,746, and the gasoline a gross value of $30,668. The total of the royalties paid from the gas well amounted to $8,476.84.
 

 As to the oil well, the proof is that from the date of the first oil runs in April 1937, through October 1937, or for approximately six months, the well produced 5,773.52 barrels of oil of a value of $5,259.18, after deducting state and federal severance taxes. The well produced on an average for the six months preceding the filing of this suit from twenty-five to thirty barrels of oil per day. The value of the oil, after deducting the severance taxes, both state and federal, averaged $750 per month and, therefore, the royalty was approximately $100 per month for the six months’ period. The amount paid in order to keep the leases alive, without drilling, was $456 per year.
 

 We have not been referred to any case which holds, under similar circumstances, that the leases should be cancelled or declared forfeited because there was not a sufficient production of oil and gas or production in paying quantities. On the contrary, under the rule of Logan v. Tholl Oil Company, Inc., et al., supra, and authorities therein cited, the well appears to have been a profitable commercial well bringing in a net profit to the lessees and furnishing an adequate consideration to the lessors for the continuance of the lease.
 

 Fourth. The defendants, lessees, meet the fourth ground of attack by averring that the plaintiffs did not make any demand upon them to further develop the property as their implied obligations. It appears that the leases do not contain any provision as to how many wells are to be drilled. The record shows that the defendant lessees are in possession of the property and are operating one producing oil well. Plaintiffs do not allege that they made any demand for further development or that they put the defendant lessees in default. In the absence of allegations and proof to
 
 *898
 
 that effect, plaintiffs are not entitled to have the leases cancelled on the grounds of failure to reasonably and further develop the leased premises. Pipes v. Payne, 156 La. 791, 101 So. 144; Hiller v. Humphreys Carbon Company, 165 La. 370, 115 So. 623; and Temple v. Lindsay, 182 La. 22, 23, 161 So. 8.
 

 Plaintiffs contend that it was unnecessary to prove that demand was made for further development and that the defendants were placed in default, because their attorney, on October 11, 1937, wrote the defendants a letter demanding a release of the oil and gas leases held by them, citing Stockelback v. Bradley, 159 La. 336, 105 So. 363, 364. The letter demanded the cancellation of the leases and made no request for reasonable development of the land. In the above case cited by counsel, the court stated:
 
 “
 
 * * * It is well settled that where a party refuses, and does not merely fail or neglect, to comply with his obligation, the other party need not formally put him in default.” In the instant case, defendant lessees have not refused to comply with any implied obligations but have simply refused to cancel the leases.
 

 Counsel for the plaintiffs strenuously insist that their clients are entitled to have a reasonable development by the drilling of one well at least 5,000 feet deep, unless oil or gas is found at a lesser depth, on every 40 acres of the leased tract, as an implied contractual obligation and a legal obligation. As we have already stated, no demand has been made for such development and the plaintiffs have not attempted to place the defendants in default in that respect. Therefore, it is unnecessary for us to pass upon this question.
 

 For the reasons assigned, the judgment of the district court is affirmed.