**Lucia BONSALL et al.**

v.

**HUMBLE OIL & REFINING COMPANY.**

**James CLEMENT, as dative tutor for the minor, Wilson Conner**

v.

**HUMBLE OIL & REFINING COMPANY.**

**Prevate BROUSSARD**

v.

**HUMBLE OIL & REFINING COMPANY.**

**Levia DUHON**

v.

**HUMBLE OIL & REFINING COMPANY.**

Nos. 7889, 7890, 7892, 7893.

United States District Court
W. D. Louisiana,
Lake Charles Division.
June 6, 1961.

---

4. Gash v. Lautzenheizer, 405 Pa. 312, 318, 176 A.2d 90.

Jones & Jones, Cameron, La., C. A. Miller, Jr., Lake Charles, La., for plaintiffs.

Plauche & Stockwell, Lake Charles, La., Bernard J. Caillouet and W. J. McAnelly, Jr., New Orleans, La., for defendant.

HUNTER, Judge.

These consolidated cases are before this Court by removal from the Fourteenth Judicial District Court for Cameron Parish, Louisiana. The suits were filed against Humble Oil & Refining Company and seek the cancellation, for nonpayment of royalties, of four separate oil, gas and mineral leases, portions of each lease forming part of producing Gas Commissioner's units in Cameron Parish, Louisiana.

Plaintiffs are residents and citizens of the State of Louisiana. Defendant, Humble Oil, is a Delaware corporation. The amount involved is far in excess of $10,000.

Humble does not dispute plaintiffs' title to the lands leased nor the fact that plaintiffs are entitled to royalties. In defense of these suits to cancel the leases, Humble urges:

(1) That no demand was made on Humble for the payment of royalties, and that there has never been a refusal on the part of defendant to make such payment.

(2) A serious legal question had to be resolved prior to the determination of the exact amount of the royalties to be re-

ceived by plaintiffs, and defendant was attempting to resolve this dispute without the necessity of provoking a concursus suit, all in accordance with its leases from plaintiffs, which provided in Paragraph 10 as follows:

" * * * and in the event the land above described, any part thereof, or an interest therein or in the royalties payable hereunder is claimed by others, lessee shall have the right to withhold without liability for interest thereon payment of royalties on production therefrom or to deposit such royalties in the registry of Court of competent jurisdiction until final determination of lessor's rights."

(3) That defendant, by the action of plaintiffs and their attorneys, was lulled into the belief that the division orders would be signed in order to avoid the necessity of filing a concursus suit at great expense to plaintiffs and that, therefore, plaintiffs are estopped to demand a cancellation of the lease (Article 41 of the answers).

These cases were tried to the Court without a jury. The Court finds the facts (most of which are stipulated) to be as follows:

(1) That Joseph Broussard executed an oil, gas and mineral lease to Albert D. Miller on February 1, 1953. This lease covers approximately 48 acres as shown by Exhibit "A" attached to the plaintiff's petition in suit No. 7889 and is the lease under attack in that suit.

(2) Lease under No. (1) was assigned to Humble on April 13, 1953. (Exhibit P-5).

(3) Plaintiffs in suit No. 7889 are the sole and only surviving heirs of Joseph Broussard.

(4) Prevate Broussard executed an oil, gas and mineral lease to Albert D. Miller on February 1, 1953. This lease covers approximately 200 acres as shown by Exhibit "A" attached to plaintiff's petition in suit No. 7892 and is the lease under attack in that suit. Prevate Broussard is the plaintiff.

(5) Lease under No. (4) was assigned by Albert D. Miller to Humble Oil & Refining Company on April 13, 1953. (Exhibit P-5).

(6) Sidney Conner executed an oil, gas and mineral lease to Albert D. Miller on February 1, 1953. This lease covers approximately 48 acres as shown by Exhibit "A" attached to plaintiff's petition in suit No. 7890, and is the lease under attack in that suit.

(7) Lease under No. (6) was assigned by Albert D. Miller to Humble Oil & Refining Company on April 13, 1953. (Exhibit P-5). Wilson Conner, plaintiff in suit No. 7890 is the sole and surviving heir of Sidney Conner.

(8) Levia Duhon executed an oil, gas and mineral lease to Albert D. Miller on February 1, 1953. This lease covers approximately 42 acres as shown by Exhibit "A" attached to plaintiff's petition in suit No. 7893, and is the lease under attack in that suit. Levia Duhon is the plaintiff.

(9) Lease under No. (8) was assigned by Albert D. Miller to the Humble Oil & Refining Company on April 13, 1953. (Exhibit P-5).

(10) Delay rentals were timely paid on each lease through August 1, 1957, as shown by affidavit of J. A. Heyl, Jr. (Exhibit Humble-10). Portions of the acreage included in aforesaid leases were included within Humble's Chenier Perdue Gas Unit No. 1, which was created by unit designation instrument dated July 26, 1956, as shown by affidavit of J. A. Heyl, Jr., Exhibit Humble-10.

(11) Humble's Cheniere Perdue Gas Unit No. 1, Well No. 1, which was located and drilled within the limits of Humble's Gas Unit No. 1 (but not on plaintiff's land) was spudded in on November 12, 1956, and was completed on March 5, 1957, as a well capable of producing gas and condensate in commercial quantities and was shut in for lack of available market.

(12) Shut in gas royalties were paid in connection with the Cheniere Perdue Gas Unit No. 1 as follows:

a. Levia Duhon, under lease owned by Humble Oil & Refining Company, dated February 1, 1953, $6.57 per month, first check issued and mailed on May 23, 1957, for the period May 25, 1957 to June 25, 1957; and in like manner monthly through the period ending October 25, 1958, for a total payment of $111.69.

b. Prevate Broussard, under lease owned by Humble, dated February 1, 1953, $20.84 per month, first check issued and mailed on May 23, 1957, for the period May 25, 1957, to June 25, 1957; and in like manner monthly through the period ending October 25, 1958, for a total payment of $354.28.

c. Sidney Conner, under lease owned by Humble, dated February 1, 1953, $4.17 per month, first check issued and mailed on May 23, 1957, for the period May 25, 1957 to June 25, 1957; and in like manner monthly through the period ending May 25, 1958, for a total payment of $50.04, and James Clement, Tutor for the Minor, Wilson Conner, under lease owned by Humble, dated February 1, 1953, $4.17 per month for the period May 25, 1958 to June 25, 1958; and in like manner monthly through the period ending October 25, 1958, for a total payment of $20.25.

d. Lucia Bonsall, Armelian Broussard, Dorestan Broussard, Ferdinand Broussard, Levan Broussard, Edwina Rutherford, Ledia Theriot and Mayola Wicke, under lease owned by Humble, dated February 1, 1953, $2.50 each per month, first check issued and mailed on May 23, 1957, for the period May 25, 1957 to June 25, 1957; and in like manner monthly through the period ending October 25, 1958, for a total of $340.00.

e. After these payments for the periods ending October 25, 1958, no further shut in gas royalty payments were made.

(13) Portions of the acreage covered by the Prevate Broussard and Levia Duhon leases were included within Humble's Cheniere Perdue Gas Unit No. 2, which was created by unit designation instrument dated June 12, 1958, recorded in the Conveyance Records of Cameron Parish, and that the Cheniere Perdue Gas Unit No. 2, Well No. 1 was located and drilled within the limits of said declared unit and was spudded in on July 8, 1958, and completed on August 16, 1958, as a dry hole. See affidavit of J. A. Heyl, Jr., Exhibit Humble–10.

(14) When Order No. 430 of the Commissioner of Conservation for the State of Louisiana became effective on September 1, 1958, creating the unit for the "I" Sand as defined by said Order No. 430, the contribution of acreage by the above identified oil, gas and mineral leases was as follows:

| Tract | Acres |
|---|---|
| Sidney Conner | 13.038 |

and Austral Oil Exploration Company, Inc. was designated as Operator. See affidavit of J. A. Heyl, Jr., Exhibit Humble–10.

(15) When Order No. 430–A of the Commissioner of Conservation for the state of Louisiana became effective on September 1, 1958, creating the unit for the "D" Sand as defined by said Order No. 430–A, the contribution of acreage by the above identified oil, gas and mineral leases was as follows:

| Tract | Acres |
|---|---|
| Prevate Broussard | 41.313 |
| Levia Duhon | 7.947 |
| Joseph Broussard | 10.821 |
| Sidney Conner | 39.536 |

and Austral Oil Exploration Company, Inc., was designated as Operator. See affidavit of J. A. Heyl, Jr., Exhibit Humble–10.

(16) When Order No. 430–B of the Commissioner of Conservation for the State of Louisiana became effective on September 1, 1958, creating the unit for the "H" Sand as defined by said Order No. 430–B, the contribution of acreage by the above identified oil, gas and mineral leases was as follows:

| Tract | Acres |
|---|---|
| Sidney Conner | 9.806 |

and Austral Oil Exploration Company,

Inc. was designated as Operator. See affidavit of J. A. Heyl, Jr., Exhibit Humble–10.

(17) When Order No. 430–C of the Commissioner of Conservation for the State of Louisiana became effective on September 1, 1958, creating the unit for the "G" Sand as defined by said Order No. 430–C, the contribution of acreage by the above identified oil, gas and mineral leases was as follows:

| Tract | Acres |
|-------|-------|
| Sidney Conner | 6.312 |

and Austral Oil Exploration Company, Inc. was designated as Operator. See affidavit of J. A. Heyl, Jr., Exhibit Humble–10.

(18) Austral Oil Exploration Company, Inc. was designated as the operator by the Commissioner of Conservation by the orders creating the "I", "D", "H" and "G" Sands.

(19) The first run of gas and condensate from the "D", "G" and "H" Sand units was on September 1, 1958 and production in commercial quantities has continued from these units to date. (Exhibit A–1). The first production from the "I" Sand Unit was had on April 2, 1959 and production in commercial quantities continued until December 12, 1959.

(20) The cost to prepare, drill, equip and complete for production Cheniere Perdue Gas Unit No. 1, Well No. 1 amounted to the sum of $363,346.23. See affidavit of J. P. Nolley, Exhibit Humble P–18. The cost to prepare, locate and drill Cheniere Perdue Gas Unit No. 2, Well No. 1 amounted to $240,595.05. See affidavit of J. P. Nolley, Exhibit Humble P–18.

(21) After the issuance of Conservation Orders Nos. 430, 430–A, 430–B and 430–C, those owning working interests met in New Orleans and Austral Oil Exploration Co., Inc., the operator, assumed the obligation of having surveys made so as to accurately determine the acreage in the units. This was necessary because of the overlapping of Commissioner's and voluntary units.

(22) When the surveys were furnished to the Humble Oil & Refining Company and checked by their Engineering Department, it was found that there were errors and additional work was required. The completed surveys were approved by Humble in the early part of March, 1959, and the overlay plats were completed on April 6, 1959. See testimony of J. P. Robbins, III.

(23) After the issuance of the Commissioner's Orders, Humble believed that a serious legal question existed over the proper payment of royalties to the plaintiffs, resulting from the fact that portions of the leases in the two voluntary units were included in the Commissioner's Units. See testimony of James A. Bugea and J. P. Robbins, III and the suits of "Humble Oil & Refining Company vs. Donald H. Jones", bearing No. 19,924, and "Humble Oil & Refining Company vs. Edwin W. Edwards, et al", bearing No. 20,047, both on the docket of the 15th Judicial District Court, Acadia Parish, Louisiana, introduced in evidence as Defendant's Exhibits 11, 12 and 13.

(24) The Humble was faced with the same legal question in one of its fields in Acadia Parish, which accounts for the filing of the Jones and Edwards declaratory judgment suits for the purpose of having the Courts resolve this legal question. The Jones suit was filed April 7, 1959, and the Edwards suit was filed May 15, 1959. (See Humble Exhibits 11, 12 and 13). The Supreme Court of Louisiana has now granted writs in these cases and they are pending there.

(25) Humble, meanwhile, continued to take the necessary steps to be in a position to pay the royalties to the plaintiffs by having the abstracts supplemented, title opinions rendered and division orders prepared.

(26) On August 24, 1959, Humble mailed to each of the plaintiffs a division order with a letter prepared by its Legal Department, explaining the legal problem and asked the plaintiffs to sign the division orders without in any way waiving any of their rights in the final deter-

mination of the ownership of the royalties. The plaintiffs received the division orders and turned them over to their attorneys, Jones and Jones. The division orders were not executed nor was the Humble Oil & Refining Company advised that the plaintiffs would not execute the division orders, nor was any demand made on Humble by the plaintiffs or their attorneys for the payment of royalties until cancellation demands were made on Humble in March, 1960.

(27) By letters dated March 17 and Mar. 18, 1960, respectively, the plaintiffs, through their attorneys, demanded the cancellation of the leases. This was the first communication that Humble had from the plaintiffs or their attorneys (See affidavit and testimony of J. P. Robbins, III).

(28) On March 28, 1960, W. J. McAnelly, Jr., of the Humble Law Department, and J. P. Robbins, III, an employee of Humble, visited Mr. Jerry Jones and Mr. C. A. Miller, Jr., attorneys for the plaintiffs, and discussed with them the letters of March 17th and 18th, 1960. At that time, the representatives of Humble made it clear that they desired to pay the royalties to the plaintiffs and discussed with the plaintiffs' attorneys the legal questions involved and also advised the attorneys that they had never received the division orders which were mailed in 1959. See affidavit of J. P. Robbins, III, Exhibit Humble–9.

(29) This desire on the part of the Humble Oil & Refining Company to pay the royalties was again expressed in their letter of April 8, 1960. Humble–1 attached to their answer.

(30) After meeting with Mr. Jones and Mr. Miller instructions were given to Mr. George W. LeVan to issue checks covering royalty based on unit production attributable to the account of those parties entitled to participate in such royalties, notwithstanding the fact that executed division orders had not been received from the plaintiffs. Two sets of royalty checks were prepared on May 3, 1960, and mailed to the plaintiffs on May 5, 1960. One set was computed on the theory that the Commissioner's unit had not superseded the declared units and the other set on the theory that it had superseded these declared units. These checks have not been returned. See affidavit of George W. LeVan, Exhibit Humble–17.

(31) On July 12, 1960, additional checks were prepared and these checks were tendered to the attorneys for plaintiffs on July 19, 1960, and the attorneys for the plaintiffs refused to accept the checks and stated that no additional tender would be required since they would not accept any additional checks. See affidavit of George W. LeVan, and stipulation in deposition of Wade D. Cook.

(32) At the present time Humble continues to stand ready and willing to pay the plaintiffs the royalties accruing to them which they have refused to accept. See affidavit of J. P. Robbins, III and agreed statement in deposition of Wade D. Cook.

## DISCUSSION—THE LAW

We are governed by the law of Louisiana. Here, as in Touchet,[1] the threshhold question is: *Under the facts, must lessors make demand for payment of royalties before they are entitled to cancellation of the leases because of non-payment of royalties?*

It is fundamental under the codal law of Louisiana that an omission or failure to act is not an active, but only a passive, breach of contract.[2] Equally fundamental under Article 1933 of LSA–C.C. is the proposition that "when the breach has been passive only, damages are due from the time that the debtor has been put in default." Having found that Humble

1. Touchet v. Humble Oil & Refining Company, D.C., 191 F.Supp. 291.

2. Article 1931, LSA–Civil Code of Louisiana; Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583; Billeaud Planters, Inc. v. Union Oil Company of California, 5 Cir., 245 F.2d 14; Touchet v. Humble Oil & Refining Company, 191 F.Supp. 291.

was *not* put in default, the relevant inquiry quickly becomes: Was Humble guilty of an active violation of its obligation?

Once administrative details have been accomplished, oil and gas royalties are to be paid, in accordance with usage and custom, on monthly basis, but between completion of a well and/or formation of a new unit and first royalty payment, some time lag is generally necessary to complete details necessary to effect these payments. Touchet v. Humble Oil & Refining Company, supra. Here, necessary administrative details were concededly completed on or about August 24, 1959. We agree with plaintiffs that what Humble did from September 1, 1958 to August 24, 1959 in the way of title examinations, surveys, etc., could have actually been accomplished in a much shorter time. However, clearly under this Court's ruling in Touchet, plaintiffs were not entitled to a cancellation prior to August 24, 1959 without first making demand on lessee for payment of royalties.

What did Humble do on August 24, 1959? Based on the advice of its legal department, it mailed out a division order with a letter explaining the legal quandary it faced in determining the correct amount of royalties. These division orders and letters were received by plaintiffs and turned over to their attorneys. Under the theory suggested by Humble therein, royalty was to be paid on the premise that the Commissioner's units did *not* supersede the voluntary units. In the letter of August 24, 1959, Humble made it clear that those entitled to royalty would not be prejudiced by the signing of the division order by using this language:

"Humble desires and is required to pay royalty exactly in accordance with its lease contracts, as those contracts and the voluntary units are now affected by the formation of the Commissioner's units. Accordingly, we suggest that we pay you in accordance with the enclosed division order, pending the court's determination as to how these royalties should be computed in a suit which we have filed. If our computations are adjudged to be correct, you will have been paid correctly. Should the Louisiana Supreme Court hold that our method of calculating the royalty is not correct, we will then make appropriate adjustments in your account."

Meanwhile, Humble filed two suits to have the legal issue determined. Both cases were decided against Humble in the lower court, and on appeal to the Louisiana Court of Appeals, the lower court's opinion was affirmed in a two to one decision. Humble made application for writs to the Supreme Court of Louisiana. These writs have now been granted and the cases await argument in the Supreme Court of Louisiana.

Plaintiffs urge that Humble should have filed a concursus suit or recorded a notice under LSA–R.S. 30:105. Humble felt that it was justified under Paragraph 10 of its lease in following the course of action that it did in trying to get its lessors to agree on a conditional method of payment, pending the determination of the legal issue.

We are not suggesting that a lessee can wait until every possible legal problem is resolved by the Supreme Court of Louisiana before paying royalties, but we do say that it would have been a very simple matter for plaintiffs to have made a demand for payment of the royalties. This is what the law requires except in cases where there is an active breach of the contract. This principle, once firmly enunciated, will give stability to the relationship between lessor and lessee under an oil, gas and mineral lease. All that was needed was a letter from the lessors.

Counsel for plaintiffs says in his brief:

"It is apparent that the Court's interpretation of the meaning of Melancon v. Texas Company will resolve the conflict present here * *. It is obvious that there is agreement on the holding in Melancon with one exception, namely: What constituted the active violation of the lease therein?"

We do believe that plaintiffs have pinpointed the decisive issue. Plaintiffs insist that Melancon[3] stands for the proposition that "where there is a fifteen months' delay in the payment of royalties that there has been an active violation of the contract." We do not so interpret Melancon. In Melancon the Court held that the defendant had been placed in default verbally in the presence of two witnesses in accordance with LSA–Civil Code Article 1911. However, the Supreme Court of Louisiana did assert that where there is an active and positive violation of lessee's obligation under the lease no demand is necessary to put lessee in default. What was this active violation? The Supreme Court of Louisiana, in Melancon, describes it as follows:

> "We think that a fair preponderance of the evidence establishes that the trial judge was justified in his finding ' * * * that the defendant declined the payment of production royalties until such time as the plaintiff entered into an agreement to enlarge the previously established production unit * * *,' and that such non-payment was a studied and deliberate means to coerce the plaintiff to accede to the proposal for revision of the lease and an enlarged production unit." (89 So.2d, p. 135).

The record here is clear that Humble never refused to pay the royalties nor has it ever questioned plaintiffs' right to them. Certainly, Humble has not been guilty of any studied and purposeful nonfeasance to coerce plaintiffs. The Court has already made findings of fact, both specifically and in this discussion, and no purpose would be served by reiterating them. It suffices to find that a fair preponderance of the evidence establishes that there was no active breach of the contract. Humble had reasonable grounds to believe plaintiffs were going along with them.

## CONCLUSION

We conclude:

(1) That under ordinary circumstances the failure to pay royalties is a passive breach, and that a putting in default is necessary before bringing a suit to cancel such a lease. Touchet v. Humble Oil & Refining Company, supra; Brown, et al. v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583.

(2) There is a distinction between an active violation of a contract where no putting in default is necessary and a passive violation where a putting in default is necessary. LSA–Civil Code Articles 1911, 1931, 1932 and 1933; Touchet v. Humble Oil & Refining Company, supra; Melancon v. The Texas Company, supra.

(3) Having found that Humble had not been put in default and that the violation here was a passive one, it necessarily follows that plaintiffs' request for cancellation be denied.

## ESTOPPEL

In defendant's answers it is alleged:

> "That by the action of plaintiffs and their attorneys it was lulled into the belief that the division orders would be signed in order to avoid the necessity of filing a concursus suit at the great expense of plaintiffs and that, therefore, plaintiffs are estopped to demand a cancellation of the leases."

Plaintiffs' attorneys were consulted early in 1959. This would mean that the attorneys who filed these suits were representing plaintiffs more than a year before they demanded cancellation of the leases in March of 1960. It is the position of Humble that plaintiffs and their attorneys stood by and permitted defendant to believe that plaintiffs would either sign the division orders or withhold demanding the royalties until the legal question had been settled in the Jones and Edwards cases. Plaintiffs could have prevented all of this difficulty by simply

3. Melancon v. The Texas Company, 230 La. 593, 89 So.2d 135.

answering the letter of Humble of August 24, 1959, or by making demand on Humble, expressing their discontent. Humble then could have filed a concursus proceeding or paid the royalties under both theories as was done after demand was made on Humble by attorneys for plaintiffs. Under the facts here, the Court might well be justified in holding that plaintiffs are estopped to demand cancellation. However, in view of our stated conclusions heretofore expressed, it is unnecessary to pass on this alternative defense.

In passing it is noted that in Melancon the Court specifically stated that a justifiable cause for delay might arise when there is a reasonable dispute as to the amount due each royalty owner. Even as of today no one knows how much will be due these royalty owners. The Supreme Court only recently granted writs, and a final determination as to how much is owed who must await the final decision there. However, lest we be misunderstood, we hasten to add that what was said in the preceding sentence would not excuse payment to the royalty owners by Humble if that payment had been demanded. But one cannot stand by silently and allow himself to be damaged when by his acts or words he could prevent the damage. The record reveals that when formal demand was made, two sets of royalty checks were prepared and mailed to plaintiffs. One set was computed on the theory that the Commissioner's unit *had not* superseded the declared units, and the other set was on the theory that it *had* superseded these declared units. These checks were refused. Humble asserts that it continues to stand ready and willing to pay the plaintiffs the royalties accruing to them. The Court assumes that these royalty payments will include interest thereon from the date of the month in which the runs were made.

Since dictating our ruling herein, we have received a copy of the opinion rendered by the Court of Appeal for the Second Circuit of Louisiana in the case of Bailey, et al. v. Meadows, et al., La., 130 So.2d 501 (No. 9502). This decision was handed down on May 5, 1961. Court and counsel have conferred concerning the applicability of the Bailey case to the cases here under consideration. Plaintiffs urge that the interpretation given Melancon, supra, in Bailey requires cancellation of the Humble leases here. Defendant vehemently disagrees. My impression is that Bailey interprets Melancon to mean that a failure to pay royalties for any appreciable length of time, *without justification,* amounts to an active breach which entitles lessor to cancel without the necessity of placing lessee in default. There it was held that on the record there was no justification for lessee's *refusal* to pay royalty for some eighteen months. It would seem therefore that the issue of whether or not the failure to pay rentals is an active or passive breach is interpreted as being dependent upon whether or not there was justification under the total circumstances. The Court is informed that the Louisiana Supreme Court has been asked to grant writs in Bailey. Be that as it may, the cases before me differ considerably from Bailey:

(a) Here, the payments were being held in abeyance awaiting a decision as to how much royalty who was to receive. In Bailey, the amounts owed the royalty owners was never in doubt and the payments were held up while the lessee sought an agreement with the operator relative to payment of pro rata part of the cost of production.

(b) Here, Humble "laid it on the line" with their letters and division orders of August 24th. In Bailey, apparently lessee never made any sort of explanation although the Court, in its opinion, speaks of "appellees' refusal to pay the royalties." This suggests a demand of some kind that was refused.

Bailey does extend Melancon's concept of an active breach, but we find nothing therein to alter our opinion heretofore expressed. If the test of an active breach is to be failure to pay royalties for an appreciable time *plus* lack of justification, then we would find that under the

total circumstances here there was justification. (The legal issue still undecided as to what royalty owner is due what; the effort to resolve this issue in the courts; the division orders and letters of August 24th; plaintiffs' failure to respond to those orders and letters; lack of demand; the tender of alternative amounts when demand was made.)

There should be judgment for defendant in each case. There is.