197 So.2d 715 (1967)
Wallace FONTENOT, Plaintiff-Appellee,
v.
SUNRAY MID-CONTINENT OIL COMPANY et al., Defendants-Appellants.
No. 1906.
Court of Appeal of Louisiana, Third Circuit.
March 21, 1967.
Rehearing Denied April 12, 1967.
On Motion to Amend Decree April 12, 1967.
Writ Refused June 6, 1967.
*717 Liskow & Lewis, by Austin W. Lewis, New Orleans, Charles C. Gremillion, New Orleans, Aaron & Aaron, by J. Donald Aaron, Crowley, for defendants-appellants.
Petitjean & Petitjean, by Martin Petitjean, II, Rayne, Huey Henry Breaux, Lafayette, for plaintiff-appellee.
EN BANC.
TATE, Judge.
The defendant mineral lessee(s) Sunray appeal from a judgment cancelling two mineral leases insofar as the leases affect the undivided 1/14th mineral interest of the plaintiff Wallace Fontenot in four tracts of land in Acadia Parish. Sunray obtained these leases from Fontenot's ancestors in title.
Sunray principally contends: (1) The cancellation of the mineral leases was erroneous, since Sunray had substantially performed its lessee obligations, and because its failure to pay royalties on two producing units was justified by the custom of the parties to initiate royalty payments only after the mineral owner had signed division orders. (2) Alternatively, partial instead of entire cancellation should be ordered, since Sunray had completely performed its obligations as to a portion of the leased interests. (3) Attorney's fees were incorrectly allowed to the plaintiff-lessor. The plaintiff answers the appeal to request an increase in the amount of awarded attorney's fees.
Facts.
The plaintiff Fontenot's parents owned about 400 acres of land. By donation and inheritance the plaintiff has acquired a one-fourteen (1/14th) mineral interest affecting this acreage (less a small outstanding royalty). In 1950 and 1952 the plaintiff's parents granted two mineral leases of this land to Sunray's predecessors in title. Sunray brought in producing wells under the leases in 1952 and 1953, and there has been continuous production since then.
In 1955 almost[1] the entire acreage was included within the Northwest Branch Field Unit formed[2] to develop two sands[3] underlying the surface area. Sunray has paid Fontenot all royalties due for production from this unit, and the plaintiff accepted them up until the plaintiff formally demanded *718 cancellation of the lease on April 9, 1963[4].
The plaintiff contends, however, that the lease should be cancelled in its entirety because Sunray had failed to pay all royalties due for production from the leased tracts. He bases his claim that Sunray breached its obligation to pay royalties upon its failure to send the plaintiff Fontenot the royalties due him for production from two much smaller units created, which included some of the leased acreage. These smaller units were created to obtain production from sands other than those unitized in the large Northwest Branch Field Unit, which overlapped with and included most of the surface acreage of the two smaller units.
These two smaller units were formed on March 1, 1960, to secure production from the MT-1 and MT-4 sands respectively[5]. Orders No. 242-F and No. 242-G. One well was to service both units. Production from the MT-1 and MT-4 units began on September 9, 1960 and January 16, 1962 respectively. No royalty was tendered the plaintiff on his share of the production from these units until April 22, 1963, which was 13 days after he had formally demanded cancellation of the leases because of the nonpayment of the royalties due to him.
Cancellation Remedy.
The trial court granted the plaintiff's demand for cancellation of the entire lease as to his entire interest[6]. In so doing, the trial court relied upon the jurisprudence to the following effect:
The failure to pay production royalties under a mineral lease for any appreciable time, without justification, amounts to an active breach of such lease which entitles the lessor to cancellation without first placing the lessee in formal default. Sellers v. Continental Oil Co., La.App. 3 Cir., 168 So.2d 435; Pierce v. Atlantic Refining Co., La.App. 3 Cir., 140 So.2d 19, certiorari denied; Bailey v. Meadows, La. App. 2 Cir., 130 So.2d 501, certiorari denied. See also: Bollinger v. Texas Co., 232 La. 637, 95 So.2d 132; Melancon v. Texas Co., 230 La. 593, 89 So.2d 135. (Under this jurisprudence, however, the mineral-owner lessor is not entitled to cancellation when adequate reason for the delay is shown by the mineral lessee. Broadhead v. Pan American Petroleum Corp., La.App. 3 Cir., 166 So.2d 329; Fawvor v. United States Oil of Louisiana, Inc., La.App. 3 Cir., 162 So.2d 602.)
We agree with the trial court that Sunray has failed to give any satisfactory explanation for its failure to pay the plaintiff the royalties due him for some thirty months. We further agree that Sunray's unjustified failure in this respect constitutes an active breach entitling the owner-lessor to a cancellation of the mineral lease. (For the reasons to be stated below, however, we are holding that the cancellation will not affect the portion of the leased mineral interest on which Sunray did not breach its lease obligations.)
*719 In urging trial court error, Sunray principally contends that the lease obligations had been mutually modified by the parties through custom and usage by the employment of division orders in connection with the payment of royalties due for production from unitized areas. Between 1952 (the date of the first lease production) and 1960 (the date of the first MT-1 and MT-4 production), as Sunray points out, on all (except one) of the occasions when new units had come into production or when there was a general revision of ownership (as after the death of each of the plaintiff's parents), Sunray had circulated multiple division orders to establish proportions of ownership of the co-owners. With rare exceptions, the co-owners had not demanded or received any royalties until after they had executed their division order. Sunray further points out that the plaintiff Fontenot himself had executed on some 7 or 8 occasions a total of 33 division orders during this 8-year period, all dealing with division of the Northwest Branch Field Unit production.
Our answer to this contention is that, in the first place, a lessee cannot establish a lease custom binding upon the lessor interests by requiring lessors to sign division orders before the lessee will pay royalties indisputably due them. Sellers v. Continental Oil Co., La.App. 3 Cir., 168 So.2d 435. In the second placepretermitting whether "custom" ever could excuse indefinite noncompliance with lease terms, the evidence does not in our opinion prove any customary course of conduct on the part of the plaintiff Fontenot which would entitle Sunray to suppose that Fontenot must either sign the MT-1 and MT-4 orders or else first notify them that he would not do so before he could demand cancellation of the lease:
Multiple division orders had been circulated on some seven or eight occasions, but in at least three instances (including the initial production on the Northwest Branch Field Unit) an agent of Sunray had hand-carried these division orders to the mineral owners and explained their purpose to them before their signature was obtained. On one major revision of ownership proportions, no division orders whatsoever were circulated or signed before Sunray paid royalties on a new basis. The record also indicates that in several other minor particular instances royalty had been paid without division order signings.
As contrasted with the prior occasions, Sunray sent to the plaintiff on January 12, 1961, a communication consisting of 95 pages of division orders and duplicates with regard to the nonpayment of MT-1 and MT-4 royalties with a request that he sign the originals and return them to Sunray. The letter concluded: "Upon your prompt execution of these division orders we shall proceed towards placing your interest in line for payment." Tr. 1269.
The materials enclosed included twelve sets of division orders and duplicates concerning the MT-1 and MT-4 units. Included on the division orders were certain stipulations to which the mineral owner would agree by signing the documents. Some of these stipulations were arguably modifications of lease obligations; all of them were favorable to the lessee. We do not feel that the transmission by mail of the bulky set of these numerous and somewhat complex documents was comparable to the comparatively minor instances where division orders had previously been transmitted and returned by mail.
The transmission by mail of this bulky series of division orders, confusing as to description of interests covered and containing stipulations which, if enforceable, would unfavorably modify some of Fontenot's rights as lessor, could not in our opinion justify Sunray withholding payment of royalties to Fontenot until he either signed the division orders or else informed them that he did not intend to do so. Sunray could not withhold payment of royalties which it undoubtedly owed because of such a unilaterally imposed condition. *720 E. g., Sellers v. Continental Oil Co., La.App. 3 Cir., 168 So.2d 435.
Sunray's failure to pay royalties due is not explained by any question as to Fontenot's right to receive them. On receiving no reply to its letter of January 12, 1961, enclosing the 94 pages of division orders, Sunray on March 8, 1961, again wrote Fontenot, stating that it had not received those orders and would appreciate his furnishing them "so that we may clear our records of proceeds creditable to your interest." Tr. 1343. Again, on February 21, 1962, Sunray transmitted Fontenot another complete set of division orders and requested that he execute them. Instead of sending the royalties due to Fontenot or at least investigating why he did not (obviously) wish to execute the division orders, Sunray simply retained the royalties due Fontenot and their use, placing them in a "suspense" account credited to his name.
The circumstances of the present case illustrate the impracticality and inequity of Sunray's position. The plaintiff Fontenot was a substantial but illiterate farmer. He did not understand the documents sent him. He did not wish to sign them because Sunray was negotiating with him concerning some unleased acreage which he did not wish to lease.
Fontenot testified that he had requested Sunray's landman to obtain the unpaid MT-1 and MT-4 royalty for him. While we agree with the trial court that the evidence as to this oral demand is inconclusive, it is indicative of the difficult practical position in which mineral owners could be placed if Sunray's view prevailed. Such owners might be required to obtain and personally pay for counsel in order to ascertain the reasons for nonpayment of royalty undoubtedly due and then to formally inform the lessee that the mineral owner, in accord with his presumed intent, does really indeed desire that the lessee perform its contractual obligation to pay mineral royalties indisputably due him.
Rather, in accord with our unanimous holding in Sellers v. Continental Oil Co., cited above, we hold that the lessee must pay royalties indisputably due, and that its unjustified failure to pay them for any appreciable time amounts to an active breach of the lease entitling the lessor to its cancellation insofar as his mineral interest is concerned. The burden is upon the mineral lessee to pay royalties indisputably due rather than upon the mineral lessor to remind the lessee to comply with its undoubted lease obligations.
In concluding, we may say that we find no authority supporting Sunray's additional position that the active breach of its lease obligation to pay royalties due to the plaintiff is excused because it did pay the entire amount of royalties due to all other mineral co-owners.
Cancellation: Total or Partial?
Finding this active breach, the trial court ordered cancellation of the lease as to the plaintiff's entire one-fourteenth (1/14th) interest. The trial court specifically cancelled the lease even as to the NB-1 and NS-1 sands (see footnote 3 above) unitized in the Northwest Branch Field Unit, although prior to demand for cancellation Sunray had paid and Fontenot had accepted all the royalty due for production from this unit. Essentially, the trial court relied upon jurisprudence holding generally that mineral leases are indivisible.
We realize the force of the argument supporting this conclusion, as well as the conceptual difficulty of excluding from the cancellation that portion of the leased mineral interest as to which the mineral lessee had performed its lease obligations.
However, in Sellers v. Continental Oil Co., La.App. 3 Cir., 168 So.2d 435, this court unanimously concluded that equitable circumstances might justify excepting from cancellation of a mineral lease that portion of the leased premises as to which the mineral lessee had fully performed *721 all lease obligations due the lessor. In reaching this result, we in part relied upon jurisprudence permitting partial cancellation under certain circumstances, and also upon jurisprudence holding that whether or not to dissolve a lease is subject to judicial control according to the circumstances, see Rudnick v. Union Producing Co., 209 La. 943, 25 So.2d 906.
In Sellers we severed the lease vertically, excluding from the cancellation one surface tract as to which all production royalty due has been paid. We see no reason why, similarly, we should not horizontally except from the cancellation of the present mineral leases the NB-1 and NS-1 sands unitized in the Northwest Branch Field Unit.[7] This result follows from acceptance of the Sellers' principle that the courts may for reasons of equity treat the lease as severable and thus except from the cancellation the leased interests as to which the lessee has complied with its lease obligations. As to the unitized sands of the Northwest Branch Unit, Sunray had paid all royalties due.
The plaintiff ably argues that, by withholding the payment of royalties due, Sunray was attempting to coerce him into signing the division orders which modified Sunray's lease obligations unfavorably as to the signing lessors. He relies upon concluding statements in Sunray's letters of January 12, 1961[8] and May 8, 1961[9] requesting division orders.
If this were so, we think that judicial control of the lease's dissolution might justifiably involve total cancellation. See Melancon v. Texas Co., 230 La. 593, 89 So. 2d 135. However, the evidence (including Sunray's treatment of another co-owner who did not sign the division orders but was nevertheless (tardily) paid royalties without signing the orders) indicates to us that Sunray's conduct was not intended to be so arbitrary and in such bad faith as to equitably justify cancellation of the entire lease.
The wording of the letters of transmittal was perhaps unfortunate. Preferably, they should perhaps have more fully informed the mineral and royalty owners that Sunray did not regard them as a prerequisite for the payment of royalty due. Nevertheless, the total pattern of Sunray's conduct is (as in Sellers) more of a bureaucratic indifference to the interests of the mineral and royalty owners, as contrasted with arbitrary bad faith in the lessee's dealing with its lessors.
As in Sellers, we regard this a proper case for partial rather than total cancellation. Between September 1, 1960 (immediately prior to MT-1 production on September 9) and April 1, 1963 (immediately prior to Fontenot's demand for cancellation), Sunray had paid all royalties due from production of the Northwest Branch Field Unit, a total of $9,558.77. During this same period it withheld payment of $2,188.19 of royalties due the plaintiff for production from the MT-1 and MT-4 units.
The nonpayment of the latter amounts was undoubtedly a substantial default entitling the plaintiff lessor to at least partial cancellation. Nevertheless, the payment of the former substantial amountsand the acceptance of them by the lessor Fontenotis a substantial equitable reason why this court should treat the lease as maintained in force as to the sands unitized by the Northwest Branch Field Unit, even though in other respects the *722 lease was actively breached by Sunray's failure to pay other royalties due. The plaintiff himself treated the leases as thus severable during the time Sunray was otherwise in default as to its lease obligations to pay royalty. Under the implications of our ruling in Sellers, he should not now be heard to complain if we sever the leased interests, since he did so himself after the breach.
For these reasons, therefore, we will amend the trial court decree so as to except from the lease cancellations the Northwest Branch Field Unit, as to which the defendants Sunray had performed all lease obligations due to the plaintiff Fontenot.

The Date of Cancellation
The trial court judgment ordered Sunray to account for the proceeds of the plaintiff's entire mineral interest from December 1, 1960, the date of production from the MT-1 sand, following which no royalties for it were ever paid. Sunray contends that the lease should not be held dissolved any earlier than trial court judgment of June 15, 1966, citing Sellers v. Continental Oil Co., La.App. 3 Cir., 188 So.2d 466 (second appeal).
The cited Sellers case is authority only for the proposition that the original trial court judgment cancelling the lease as of its date had become final and could not be varied in these subsequent proceedings.
Exercising the judicial discretion permissible in effectuating the cancellation remedy, the courts have in the other cited decisions cancelled leases at earlier dates. In Pierce this court decreed cancellation of the lease as of the date of a written demand for cancellation prior to suit. 140 So.2d 19, 30. In Bailey, the Second Circuit ordered cancellation as of the date of production (as did the trial court in the present case), although this was two and one-half years prior to suit. 130 So.2d 501, 509. In Bollinger, 95 So.2d 132, as inspection of the Supreme Court's record indicates (Supreme Court Docket No. 43263), the lease was cancelled as of date of judicial demand, as apparently was done in Melancon, 89 So.2d 135 (where, however, the trial court judgment does not explicitly so provide; Supreme Court Docket No. 42688).
Under all of the present circumstances, we think that the lease should be held dissolved as of April 9, 1963, the date of the plaintiff's proven formal demand for the lease's dissolution. On this date the plaintiff-lessor formally notified the Sunray lessees that he had exercised his rights to secure the dissolution of the lease because of the lessee's breach. Civil Code Articles 2046, 2047, 2729. To delay the dissolution of the lease until the trial court judgment (here, in 1966, three years later) is to place a premium upon possible dilatory tactics by a defaulting lessee when the lessor sues to obtain cancellation of the breached lease.
The Plaintiff's Right to Attorney's Fees.
The trial court awarded the plaintiff $4,000 attorney's fees under LSA-R.S. 30:102. This statute provides for the lessee's liability for attorney's fees if he refuses to cancel an expired lease after written demand by the lessor.
Here, the plaintiff-lessor had sued for and in the trial court had obtained the entire cancellation of the lease. There was no alternative demand for a partial cancellation.
Under the jurisprudence, it seems that the attorney's fees should not be allowed because the lessor does not obtain an entire cancellation of the lease under our amended decree. Where a lessor demands full cancellation of a lease and, upon suing, is granted only a partial cancellation, he is not entitled to attorney's fees under LSA-R.S. 30:102. Leaderbrand & Hardy v. Shallow Oil Co., 234 La. 796, 101 So.2d 673; Bailey v. Meadows, La.App. 2 Cir., 130 So.2d 501; 19 La.L.Rev. 328. (These cases note that if, however, the lessor's demand is for *723 only a partial cancellation, and he is granted the entire relief which he seeks, he is entitled to attorney's fees. Nunley v. Shell Oil Co., 229 La. 349, 86 So.2d 62; Wier v. Grubb, 228 La. 254, 82 So.2d 1; 19 La. L.Rev. 328.)
Decree.
For the reasons assigned in this opinion, we amend the trial court opinion (a) so as to deny the plaintiff's claim for attorney's fees and (b) so as, with regard to the decree cancelling the leases, except from the cancellation the plaintiff's mineral interest in the Nodosario Blanpiedi No. 1 and the Nonion Strume No. 1 Sands unitized by the Unitization Agreement dated January 31, 1955, executed by the plaintiff and recorded July 14, 1955, as document No. 274519, Conveyance Book ___, page ___, records of Acadia Parish, and as further set forth by Order No. 242-C dated December 13, 1956, of the Commissioner of the Department of Conservation of Louisiana. In all other respects we affirm the judgment of the district court ordering cancellation and an accounting. The defendants-appellants are to pay all costs.
Amended and affirmed.
FRUGÉ, J., concurs in part and dissents in part, believing that the entire lease affecting plaintiff's undivided interest should have been cancelled as did the trial Judge.

On Application for Rehearing.
En Banc. Rehearing denied.
Frugé, J., votes for rehearing.

On Motion to Amend Decree.
En Banc.
PER CURIAM.
By motion to amend the decree in our original opinion, the defendants-appellants point out that through inadvertence our decree did not contain a further amendment specified by our opinion. We find the contention well founded.
Accordingly, in addition to the amendments (a) and (b) specified by our original decree, we further amend the district court judgment so as, additionally, (c) to decree the date of partial cancellation of the lease to be as of April 9, 1963.
In all other respects, as amended, our original decree is reinstated.
Decree amended.
NOTES
[1] The mineral lessees concede that the lease on the small portions of the acreage outside the unit has expired for nonproduction and failure to pay royalties.
[2] Unitization Agreement, dated January 31, 1955; and Conservation Commissioner Orders 242 and following, especially Order No. 242-C of December 13, 1956.
[3] The Nodosario Blanpiedi No. 1 Sand and the Nonion Strume No. 1 Sand, Northwest Branch Field, Acadia Parish, Louisiana.
[4] Following this demand, the plaintiff refused to accept royalties tendered for production from the Northwest Branch unit, consistent with his contention that the entire lease had been terminated due to Sunray's failure to pay royalties on the two other units. See below.
[5] The full name of the sands unitized were the Marginulina Texana No. 1 Sand and the Marginulina Texana No. 4 Sand.
[6] Plaintiff originally joined as defendants the owners of the other 13/14th interest in the mineral rights affecting the tracts in question. Sunray filed a motion for a summary judgment, which was granted as to all the co-owners except the plaintiff, based on Sellers v. Continental Oil Co., La.App. 3 Cir., 168 So.2d 435. We there held that the lease would not be cancelled as to co-owners who had been paid royalties due and who did not sue for cancellation because of any breach of any obligation to pay co-owners. The plaintiff does not appeal from this summary judgment dismissing this portion of his claim.
[7] See order of Commissioner of Conservation 242-C dated December 13, 1956, and unitization agreement dated January 31, 1955, recorded in the records of Acadia Parish.
[8] "* * * Upon your prompt execution of these division orders, we shall proceed towards placing your interest in line for payment." Tr. 1269.
[9] "* * * Pending receipt of the above mentioned division orders, we shall continue to hold your interest in suspense." Tr. 1343.