272 So.2d 697 (1972)
R. E. HIBBERT, Plaintiff-Appellant,
v.
William MUDD et al., Defendants-Appellees-Appellants.
No. 4022.
Court of Appeal of Louisiana, Third Circuit.
December 13, 1972.
Rehearing Denied January 24, 1973.
*700 Bailey & Hollier by William C. Hollier, Lafayette, for plaintiff-appellant.
Domengeaux & Wright by James Domengeaux, Lafayette, for defendant-appellee.
Before SAVOY, CULPEPPER and MILLER, JJ.
MILLER, Judge.
In Hibbert v. Mudd, 187 So.2d 503 (La. App. 3 Cir. 1966), [writ denied 249 La. 714, 190 So.2d 233 (1966) because the judgment was not final] we reversed the trial court's summary judgment. We found a genuine issue of fact and remanded for a determination of whether the marriage of Frank Mudd and Agnes Sinclair was miscegenous.
On remand the parties stipulated to many facts and specifically that the Mudd Sinclair union was miscegenous. The trial court adopted the dissent reported in 187 So.2d 503 at page 508 as the applicable law relative to inheritance by miscegenous natural children. Tr. Vol. II, page 69. Additionally, the trial court cited Loving v. Commonwealth of Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) as supporting that result. These issues are not before this court[1] because the State of Louisiana did not appeal. The natural brothers and sisters of lessor Edna Mudd Anderson have been recognized as the sole heirs of lessor Edna Mudd Anderson.[2]
Plaintiff R. E. Hibbert instituted this concursus proceeding on July 19, 1963 and on that date deposited in the registry of court the royalties which had accumulated to the owner of land leased by Hibbert from Anderson. Except for an alleged telephone call, Hibbert made no prior attempt to pay these royalties which accumulated from production starting December 9, 1961 through January 14, 1962. The production was under a voluntary unit dated September 15, 1961, recorded in Book 35, Folio 387, Entry No. 414582, Conveyance Records of Lafayette Parish. Hibbert also held royalties produced from January 15, 1962 through April 2, 1962 under the second unit when that forced unit was approved by the Louisiana Conservation Commission.
Cited as defendants having conflicting claims to the royalties were the State of Louisiana (which could claim the property by escheat if Anderson left no heirs) and certain alleged natural brothers and sisters, and/or their descendants, of lessor, Edna Mudd Anderson, who died intestate in 1961. Some of the defendants were born of an alleged miscegenous union and others were born of an adulterous union all as stipulated at trial.
The Mudd-Sinclair group reconvened seeking cancellation of the lease because of Hibbert's failure to pay royalties for nineteen months after production. The trial court cancelled the lease on finding lessee had actively breached the lease contract. LSA-R.S. 30:105 and 106.[3] Pierce v. Atlantic *701 Refining Company, 140 So.2d 19 (La.App. 3 Cir. 1962). However the trial judge refused to cancel those portions of the lease which were in production citing the lease provisions that "... in the event of the forfeiture of this lease for any cause the lessee shall have the right to retain around each well producing oil, gas or other minerals, the number of acres fixed and located by (the Louisiana Conservation Department) under which said well is being drilled or produced ..." Paragraph 3 of lease, Vol. I, Tr. 9. Attorney's fees of $7,500 (the parties stipulated that amount IF landowners were entitled to fees) were awarded under LSA-R.S. 30:102[4]
Plaintiff Hibbert appealed the judgment insofar as it cancels the lease outside the units and awards attorney's fees. The Mudd-Sinclair group answered the appeal, seeking cancellation of the lease in its entirety. We affirm the trial court's cancellation of the lease and award of attorney's fees and reverse the holding that lessee is entitled to retain the producing lands.
There is an issue of fact and an issue of law presented in this case. Although many facts were stipulated, others must be gleaned from the depositions and answers to interrogatories filed in evidence.
The factual issue is: When did lessee Hibbert learn that lessor Anderson had died? The legal issue is: Does death of a lessor relieve lessee from paying the royalties required by the lease? More particularly is LSA-R.S. 30:105 suspended when lessee withholds royalties on learning of lessor's death? We find that it does not.
A lease should not be cancelled when the delay in paying royalties is based on a bona fide title dispute. Mire v. Hawkins, 177 So.2d 795 (La.App. 3 Cir. 1965); Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La.App. 3 Cir. 1964); Fawvor v. U. S. Oil Company, 162 So.2d 602 (La.App. 3 Cir. 1964); Bonsall v. Humble Oil & Refining Company, D.C., 201 F.Supp. 516; 300 F.2d 150 (5th Cir. 1962).
We agree that eight months after royalty was due (it was due under the voluntary unit which produced from December 9, 1961 through January 14, 1962) Hibbert learned FOR THE FIRST TIME that there was a bona fide title dispute as to who inherited from Edna Mudd Anderson. But note this: there is not now and never has been a question as to Edna Mudd Anderson's title to the property. Hibbert first learned of a possible title dispute as to who inherited from Anderson on September *702 10, 1962 when he received the demand for cancellation of the lease. Although there was no question as to Anderson's title to these royalties, Hibbert continued to hold them until July 19, 1963 when he first deposited the accumulated royalties into the registry of court.
Hibbert does not contend that he knew of a title dispute prior to September 10, 1962. Until that date, he contends only that he knew that his lessor Edna Mudd Anderson had died. She died on September 20, 1961.
Lessee's proof that he was justified in withholding royalties because he knew of Anderson's death is meager. The only evidence offered to prove this knowledge is Hibbert's selfserving unsupported testimony that he was informed of her death by two people and that he later received a newspaper clipping which noted her passing. Deposition of R. E. Hibbert, Tr. Vol. II, p. 4. Hibbert does not pin down the time that he allegedly learned of her passing. The record allows two inferences: 1) lessee learned of Anderson's death shortly after completing the well on her property, or 2) he later learned of her death, possibly as late as September 10, 1962 when the Mudds demanded cancellation of the lease. It is argued that we should accept the former interpretation because Hibbert's testimony is uncontradicted. It is difficult to establish when a party first learned of a certain fact. In making that determination, we look to his response to the information.
If Hibbert promptly learned of Anderson's passing, his response falls so far short of the requirements needed to maintain his lease, that he has lost the lease under LSA-R.S. 30:105. What did he do? He testified that he telephoned (Vol. II, p. 18, line 17) the Mudd's attorney's office and asked "a girl" (Vol. II, p. 13, line 18) if he could speak to the Mudd's attorney. When told by telephone that the attorney was out, Hibbert asked "a girl" to send him a copy of the judgment of possession in the Anderson succession as soon as it was signed. He did not identify the girl or the approximate date when he allegedly telephoned. Hibbert did not testify 1) that he established that the firm was handling the succession; 2) that he asked to have an attorney return his call; or 3) that he sought advice as to what he should do with the accumulated royalties or those which would accumulate pending receipt of a judgment of possession. Hibbert did not attempt to follow up this alleged telephone call. He never wrote a letter to the firm and never spoke to a lawyer about the problem of what he should do with the accumulating royalties.
When asked what he would have done had not the succession been opened, Hibbert replied "That is a technicality on which we would have followed the law, whatever the law required." Vol. II, p. 17. His actions do not support this testimony. He admits that it is a legal question, yet he made no effort to determine what the law required. So far as this record shows, Hibbert first consulted an attorney to determine the proper disposition of the accumulated royalties after receiving the demand for cancellation of the lease.
On the basis of a telephone call (we note again, there is not one shred of evidence to suggest when this telephone call was made) and conversation with "a girl" in the office of Mudd's attorneys, Hibbert withheld royalties admittedly due from January 14, 1962 until he first learned of a bona fide title question as to who inherited Anderson's property. This knowledge came with the cancellation demand of September 10, 1962.
After September 10, 1962, Hibbert had a bona fide reason to withhold royalties from the Mudds, but not from Anderson's heirs whoever they might be. A title problem as to who inherited from Anderson does not entitle Hibbert to withhold royalties due to Anderson's successors, whoever they might be. Hibbert held these royalties until July 19, 1963 when he *703 deposited them in the registry of court. For over eighteen months, Hibbert had the use of these royalties which had been due since January 14, 1962.
Hibbert's timely knowledge of Anderson's death is basic to his defense against the lease cancellation. We could not fail to cancel the lease if Anderson were alive and Hibbert failed to pay royalties for either eight or eighteen months. LSA-C.C. Art. 2712. Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (1956). Hibbert's testimony that he knew of Anderson's death was insufficient to carry his burden of proving that he was justified in withholding royalties. The trial court may have rejected his testimony as lacking credibility (although this was not specifically stated). This is suggested because the lease was dissolved. And if the trial court rejected Hibbert's testimony, there was no manifest error in that determination.
Even if we accept Hibbert's contention that he promptly learned of Anderson's passing, what was his duty? The lease specifically provides for that contingency in paragraph 9:
"All provisions hereof shall extend to and bind the successors and assigns (in whole or in part) of Lessor and Lessee; but no change in the ownership of the land or any interest therein of change in the capacity or status of Lessor whether resulting from sale, inheritance or otherwise, shall impart any additional burden on Lessee nor shall any change in ownership or in the status or capacity of Lessor impair the effectiveness of payments made to Lessor herein named unless the then record owner of said lease shall have been furnished thirty (30) days before payment is due with certified copy of recorded instrument or judgment evidencing such transfer, inheritance or sale or evidence of such change in status or capacity of Lessor. The furnishing of such evidence shall not affect the validity of payments theretofore made in advance ..."
Under the express terms of the lease, lessee is protected when he pays royalties to the named lessor. He testified that he knew her last address; had received no request that payments be sent elsewhere; and that he had not sent royalty payments to anyone.
The lease drawn by lessee was so worded in order that lessor or her successors would have the burden and duty of notifying lessee of the changed status of lessor. In this way and by the express lease terms, lessee is given a mode of payment which protects its interest should lessor die. The corollary to lessor's duty to notify is a corresponding duty of lessee to continue to pay royalties to the named lessor. Were it otherwise, and lessee had discretion under the jurisprudence to withhold payment until notified, at least one obvious inequity would result: lessee would derive the unintended windfall of interest-free use of another's money while the heirs (whoever they might be) waited sans accumulated interest on their royalties. As demonstrated by this case, it sometimes takes years to get a recognized judgment of possession. See also concurring opinion in Pierce v. Atlantic Refining Company, 140 So.2d 19, 31 (La.App. 3 Cir. 1962).
No provision of the mineral lease and no provision of law has been cited which allows lessees to withhold payment of royalties when a lessor dies. Absent such authority, the court will strictly interpret the mineral lease with ambiguities construed against the lessee who prepared it. Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649 (1961): Pecot v. Callery Properties, Inc., 247 So.2d 160 (La.App. 1 Cir. 1971).
The lease provides an adequate and definite mode of payment. To allow lessee to delay rentals when he learns of lessor's death would expand the ambit of the term *704 "justified" as it has been used in the jurisprudential rule that delay in making royalty payments will not result in lease cancellation when the delay is "justified." Bonsall v. Humble Oil & Refining Company, D.C., 201 F.Supp. 516; 300 F.2d 150 (5th Cir. 1962); Fawvor v. U. S. Oil Company, 162 So.2d 602 (La.App. 3 Cir. 1964); Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La.App. 3 Cir. 1964); Mire v. Hawkins, 177 So.2d 795 (La.App. 3 Cir. 1965).
"The lessee may be expelled from the property if he fails to pay the rent when it becomes due." LSA-C.C. Art. 2712. On death of the lessor, we cannot countenance a lessee's nonpayment of rent for eight or eighteen months while it enjoyed the benefits of the lease.
Mineral royalties are the same as rent. Mineral leases are to be construed according to the same codal provisions applicable to ordinary leases. Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956).
Failure to pay mineral royalties to a lessor is a grievous wrong which results in the harsh but necessary expedient of lease cancellation. Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957); Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Fontenot v. Sunray Mid-Continent Oil Company, 197 So.2d 715 (La.App. 3 Cir. 1967), writ refused, 250 La. 898, 199 So.2d 915 (1967). In order to avoid cancellation, lessee must carry the awesome burden of establishing that his failure to pay was justified. Mire v. Hawkins, 177 So.2d 795 (La.App. 3 Cir. 1965); Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La.App. 3 Cir. 1964); Fawvor v. U. S. Oil Company, 162 So.2d 602 (La.App. 3 Cir. 1964); Bonsall v. Humble Oil & Refining Company, D.C., 201 F.Supp. 516; 300 F.2d 150 (5th Cir. 1962).
Having found that the trial court properly cancelled the lease, we consider the reservation to lessee of the developed property. The trial court cited no authority for this holding.
An identical provision was considered in the case of Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956). The Supreme Court refused to recognize the provision stating that to except the developed land "... would lead to an anomalous, if not ridiculous, situation, for the lessor would be at the mercy of the lessee." The court went on to state that "... this is an equitable provision for the benefit of the lessee and apply(s) to those cancellations involving a bona fide dispute as contemplated in the first clause of this particular paragraph."
Hibbert contends that there was a bona fide dispute as to the title, and therefore he is entitled to retain the developed lands. Hibbert did not know of a title dispute until September 10, 1962. And that title dispute did not concern the last record owner. For eight to eighteen months, Hibbert withheld royalties which he was required to pay to the last record owner (Anderson). There was no bona fide title dispute as to her ownership. He knew her last address, that she was the last record owner, and that he had received no requests to pay royalty to others.
The trial court judgment is affirmed with the exception of that part of the decree recognizing Hibbert's lease as to Anderson's interest in the following lands:
1) 1,089.018 acres, Anderson Sand Unit "A" established by Louisiana Department of Conservation Order 197-G-1, effective May 13, 1970.
2) 323.41 acres, Stutes Sand Unit "M", established by Louisiana Department of Conservation Order 197-C-11, effective May 13, 1970.
That portion of the trial court judgment is reversed. All costs of court are taxed to plaintiff-appellant.
*705 Affirmed in part. In part reversed and rendered.
CULPEPPER, Judge (dissenting).
I respectfully dissent, being of the opinion the circumstances of this case do not justify the drastic remedy of a cancellation of a mineral lease.
THE LAW ON LEASE CANCELLATION
The Mudd-Sinclair group rely on Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957); Bailey v. Meadows, 130 So.2d 501 (La.App. 2d Cir. 1961), and Pierce v. Atlantic Refining Company, 140 So.2d 19 (La.App. 3rd Cir. 1962). These cases hold that the failure to pay production royalties under an oil and gas lease, for an appreciable length of time, without justification, amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default. For instance, in Melancon, which was the first case to announce this rule, the lessee failed to payroyalties for 15 months, despite repeated requests on the part of the landowner for payment. The court found "the non-payment of royalties by the defendant was not the result of negligence or inadvertence, but a studied and purposeful nonfeasance designed and intended to pressure the plaintiff into the acceptance of an enlarged production unit contrary to his express desires and the terms of the contract."
Hibbert contends that all of these cases are distinguished on the grounds that they did not involve a bona fide title question or other adequate reasons for the delay in royalty payments. Plaintiff points to the following language in Melancon which expressly states that title questions can justify delay in payment:
"A justifiable cause for delay in such payment might arise when there is a reasonable dispute as to those entitled to receive the royalties, or the amount due each, but no such factual situation is here presented, and we agree with the trial judge that a delay of fifteen months for no valid reason is unjustifiable and violative of the terms of the contract."
The Bollinger, Bailey and Pierce cases, supra, also contain language stating that the delay in royalty payments may be justified because of title questions or other adequate reasons.
Hibbert relies on Bonsall v. Humble Oil & Refining Company, D.C., 201 F.Supp. 516; 300 F.2d 150 (5th Cir. 1962); Fawvor v. U. S. Oil Company, 162 So.2d 602 (La.App. 3rd Cir. 1964); Broadhead v. Pan American Petroleum Corporation, 166 So. 2d 329 (La.App. 3rd Cir. 1964) and Mire v. Hawkins, 177 So.2d 795 (La.App. 3rd Cir. 1965). In these cases the court held the delay in royalty payments was justified because of title disputes or other reasons. For instance, in Mire, we distinguished Melancon and its progeny on the following basis:
"In the present instance, there was a genuine and bona-fide dispute as to the plaintiffs' ownership of other mineral ownership whatsoever in the Mire tract,; which the other co-owners have denied in these proceedings. It was necessary to resolve various serious and unsettled questions of law before it could be determined that the plaintiffs had not lost by prescription any mineral rights they still owned affecting the Mire tract. Under the provisions of the lease, the mineral lessees were authorized to withhold payment of royalties in the event of a dispute as to their ownership. We are cited to no applicable statute or jurisprudence justifying the drastic remedy of cancellation of a mineral lease under such circumstances."
HIBBERT'S DELAY IN PAYMENT JUSTIFIED BY TITLE DISPUTES
Applying these rules to the facts of the present case, Hibbert's delay in making *706 royalty payments was justified. Briefly, the facts are that this lease became productive on December 9, 1961, which was approximately two months after the lessor, Edna Mudd Anderson, died on September 20, 1961. Hibbert's testimony is uncontradicted that shortly after production commenced he learned of the lessor's death and, in order to determine the new owners, sought a copy of the judgment of recognition and possession rendered in her succession proceedings on December 5, 1961. He says he contacted the office of the attorneys who handled the succession, who are the same attorneys who represent the Mudd-Sinclair group in these proceedings, and are also the attorneys who did the title work for Mr. Hibbert when he purchased the lease. It is stipulated that Hibbert was never furnished with a copy of the judgment of recognition and possession, nor with copies of the sale by the Sinclair-Birrat group to William Mudd.
Following the commencement of production, three forced units were established by the Department of Conservation. This required that surveys of the units be made and approved by the Department. One survey was approved after five months, but the other two were not approved for 10 or 11 months. Of course, no royalty payments could be made until after these surveys were completed.
The first demand for cancellation of the lease was made on September 10, 1962, approximately nine months after first production. The stipulation shows that between Hibbert's receipt of this demand and the filing of this concursus action, counsel for Hibbert and counsel for both the Mudd-Sinclair and the Sinclair-Birrat groups engaged in negotiations and exchanged correspondence relative to the disputed ownership of the property. The last offer of compromise by the claimants was made on July 9, 1963. This offer was rejected on July 19, 1963 and the concursus proceedings was filed and the production royalties deposited on the same date.
Hibbert takes the position that he could not pay royalties because he simply did not know who owned the land. The facts clearly support him. The Mudd-Sinclair children were born of the unmarried union between Frank Mudd and Agnes Sinclair. The evidence is conclusive that Frank Mudd was white and Agnes Sinclair was negro. At least until 1967, when the United States Supreme Court decided Loving v. Commonwealth of Virginia, supra, Louisiana law was that a child born of a miscegenous union was incapable of being acknowledged and enjoyed no rights of inheritance whatsoever, LSA-C.C. Article 204; Succession of Gravier, 125 La. 733, 51 So. 704 (1910); Succession of Davis, 126 La. 178, 52 So. 266 (1910); and Hibbert v. Mudd, 187 So.2d 503 (La.App. 3rd Cir. 1966), and the authorities cited therein. It may be that Loving v. Commonwealth of Virginia has the effect of declaring all miscegenation statutes unconstitutional. But, the Loving case applied to a penal statute and there could be a question as to whether it extends to civil statutes such as the one involved in the present case. Nevertheless, during the time Hibbert delayed payment of royalty in 1961, 1962 and 1963, there was a very serious legal question as to whether the Mudd-Sinclair group owned any interest whatever in this property.
Furthermore, there was also a very serious question as to the claims of the Sinclair-Birrat group. The evidence is clear that these claimants were born of the adulterous union between Agnes Sinclair and Lawrence Birrat. Under Louisiana law, a child born to an adulterous union is incapable of being acknowledged and enjoys no rights of inheritance whatever, LSA-C.C. Article 920; Marshall v. Smedley, 166 La. 364, 117 So. 323 (1928); and Prieto v. Succession of Prieto, 165 La. 710, 115 So. 911 (1929). It may be that there is some question as to the constitutionality of this code article under recent federal decisions. But during the time in question, 1961, 1962 and 1963, Louisiana law was clearly to the *707 effect that the issue of an adulterous union were incapable of acknowledgment and had no rights of inheritance.
Additionally, even assuming that the Mudd-Sinclair children and the Sinclair-Birrat children were legally capable of acknowledgment, there was a serious factual question as to whether they had actually been acknowledged. Claimants do not contend there was a formal acknowledgment. And there were serious factual issues as to whether there had been an informal acknowledgment.
The Mudd-Sinclair group argue that these title issues do not justify the delay in, royalty payments because this was not Hibbert's real reason for the delay. My appreciation of the facts shown by the record is entirely different. Mr. Hibbert testified that when he purchased the lease from Edna Mudd Anderson in 1959, the same attorneys who now represent the Mudd-Sinclair group did the title work. Accordingly, when production commenced in December of 1961, and Hibbert learned that Edna Mudd Anderson was deceased and that this same law firm had handled her succession, he logically called their office and asked for a copy of the judgment of recognition and possession. He says he did not talk to a member of the firm but left the message with a secretary. His testimony is not contradicted and appears to be logical.
Of course, it is stipulated that Hibbert never received a copy of the judgment of recognition and possession. It may be true that before the letter of demand, nine months after production commenced, and the negotiations which followed for ten months, Hibbert did not know the names of the claimants nor the nature of the serious title questions. But it is also true that he knew Edna Mudd Anderson was dead and he did not know who had inherited the property. Of course, the lease requires that the lessee be notified of any change in ownership. No notice of the names of the claimants was given until the letter of demand, and this revealed the serious title issues discussed above.
THE ARGUMENT THAT HIBBERT SHOULD HAVE COMMENCED PAYMENT ON THE BASIS OF THE JUDGMENT OF RECOGNITION AND POSSESSION
The Mudd-Sinclair group argues that when Hibbert learned of the judgment of recognition and possession he should have started royalty payments to these named heirs. The answer to this argument is that the succession proceedings were ex parte and state on their face that these were irregular heirs. Unlike regular heirs, who enjoy seizin, natural children and other irregular heirs own no interest in the property until they have filed a contradictory proceedings with other irregular heirs or claimants and have been recognized as owners by a judgment. See LSA-C.C. Article 949; Glenn v. West, 151 La. 522, 92 So. 43 (1922); Succession of Giordano, 188 La. 1057, 178 So. 627 (1938); and Succession of Allen, 44 La.Ann. 801, 11 So. 42 (1892). Thus, the proceedings in the Succession of Edna Mudd Anderson show on their face that Hibbert was justified in not paying royalty to these irregular heirs.
THE ARGUMENT THAT HIBBERT SHOULD HAVE PAID ROYALTY TO THE BANK DESIGNATED IN THE LEASE TO RECEIVE RENTALS
The Mudd-Sinclair group argues that Hibbert should have paid royalty to the First National Bank of Lafayette, which was designated in the lease to receive "rentals". The answer to this argument is that the bank was designated to receive only rentals and not royalty payments.
THE ARGUMENT THAT HIBBERT SHOULD HAVE PAID RENTALS TO THE "ESTATE" OF EDNA MUDD ANDERSON
The Mudd-Sinclair group also argues that Hibbert could have simply made royalty checks payable to the "Estate of Edna Mudd Anderson." Of course, the succession *708 proceedings were merely for recognition and possession. No administrator or other succession representative was appointed or qualified. When not under administration, an "estate" or "Succession" does not exist as a legal entity under Louisiana law, Succession of Coco, 185 La. 901, 171 So. 70 (1936); Tulane University of Louisiana v. Board of Assessors et al., 115 La. 1025, 40 So. 445 (1905); and Dion v. Knap, 230 So.2d 842 (La.App. 1st Cir. 1970). These cases hold that when a person dies the ownership of his property is not vested in an abstract entity known as a "succession" or an "estate". In the present case there were no regular heirs who were seized of the property, no irregular heirs who had been properly recognized as owners, and there was no succession under administration whose representative could receive the royalty payments. There was no one to whom Hibbert could safely pay the royalty.
HIBBERT'S WITHHOLDING ROYALTY NOT IN VIOLATION OF LSA-R.S. 30:105
The claimants contend and the majority holds, that Hibbert's withholding of royalties violated LSA-R.S. 30:105 which provides as follows:
"It shall be unlawful for a person acquiring mineral rights from, or mineral rights under a lease by, the last record owner and holding under an instrument sufficient in terms to transfer title or for a person purchasing mineral products to withhold payment of any rentals, royalties or other sums due to a party holding an interest in the minerals, or under the lease."
This statute has no application here since the claimants are not the "last record owner and holding under an instrument sufficient in terms to transfer title." An ex parte judgment of recognition and possession is declaratory, and not translative of title, Everett v. Clayton, 211 La. 211, 29 So.2d 769 (1947). Furthermore, in the above cited case of Mire v. Hawkins, 177 So.2d 795 (La.App. 3rd Cir. 1965), we clearly held that this statute has no application to a situation where royalties are withheld because of serious unresolved title questions.
For the reasons assigned, I respectfully dissent.

ON APPLICATION FOR REHEARING
Before SAVOY, CULPEPPER and MILLER, J J.
MILLER, Judge.
The thrust of plaintiff appellant's application for rehearing is his contention that our opinion represents an erosion of the concept of "justification" in the jurisprudence dealing with lease cancellation, and renders the rights of an oil and gas lessee "more illusory than real when ownership changes are worked by the lessor's death." The well prepared application raises several issues which have been carefully considered and are here rejected.
We hold to the opinion that Hibbert's failure to pay royalties was not "justified" as that term has been defined in the jurisprudence. Had Hibbert exercised but a modicum of diligence in attempting to ascertain his legal obligation under the lease after he allegedly learned of Mrs. Anderson's death, his "rights" would be far from "illusory," rather they would be as sure and certain as the lease terms which he breached.
Before discussing the merits of Hibbert's arguments, we take note of his contention that our construction of the lease (as requiring payment of royalties to the named lessor until proper "notice" is received by lessee) presents a "third mode" of payment which had never been urged by the Mudd-Sinclair Group in the trial court and did not appear in the trial court's reasons for judgment. Hibbert argues that the Mudd-Sinclair Group only claimed that payment of royalties should have been made to *709 them or to the estate of Mrs. Anderson. It is argued that the trial court awarded partial cancellation of the lease because Hibbert should have paid royalties to lessor's "estate"; that this was impossible because "... when not under administration an `estate' or `succession' does not exist as a legal entity under Louisiana law."
Hibbert confuses the definition of "estate" with that of "succession." LSA-C.C. Art. 448 provides that
"The word estate in general is applicable to any thing of which riches or fortune may consist. This word is likewise relative to the word things, which is the second object of jurisprudence, the rules of which are applicable to persons, things and actions."
See also the discussion of this definition at 1 A. Yiannopolus, Louisiana Practice Civil Law of Property § 9 (1966).
There is no doubt that the trial judge used the word "estate" in that context. The trial court, in alluding to the mode of payment contained in the lease, didn't interpret the lease to require payment of royalties to an entitya "succession" as Hibbert states. Rather he held that lessee would be protected under paragraph 9 of the lease by paying royalties to Mrs. Anderson "or her account." These are the precise words found in the trial court opinion.[1]
At Tr. Vol. II, p. 17, counsel for appellee raised this issue by asking Hibbert if anyone told him not to issue a check in the name of Edna Mudd Anderson and mail it to her address following the production date of this particular well. He gave a negative reply.
There is no merit to applicant's persuasive suggestion that the trial court's "written reasons (did not) even remotely suggest that Hibbert had a third mode of payment open to himpayment of royalties to the named lessor."
Hibbert argues that LSA-R.S. 47:2413 (B) required him to withhold payment of royalties to the named lessor following her death until he had received a certified copy of the judgment of possession. Essentially this argument is that lessee is "protected" under the "notice" provisions of paragraph 9 of the lease as to the effectiveness of payments made without benefit of certified evidence of an ownership change; he is also protected against the imposition of "additional burdens" resulting from such an ownership change until he receives certified evidence. It is argued that it will not do to say that Hibbert would have been "protected" as to the effectiveness of payments to the named lessor if, by making those payments, an additional burden would have been imposed on him as a direct result of an ownership change worked by lessor's death. The additional burden which the rehearing application suggests is that had lessee paid to the named lessor or to the lessor's "estate" prior to receipt of a certified copy of a judgment of possession, his doing so would have been in violation of LSA-R.S. 47:2413(B)[2], and would have *710 subjected Hibbert to the risk of personal liability for inheritance taxes due as a direct result of the change in ownership.
We reject this contention. The statute does not, as Hibbert states, prohibit the release of funds or property belonging to a deceased person; it prohibits their delivery to heirs or legatees of the deceased person. The distinction is important. The effect of our opinion and our interpretation of the cited statute is to protect the State's interest in securing inheritance taxes while at the same time giving effect to the lease provisions requiring the payment of royalties. We protect lessee's interest by honoring the payment of royalty in accordance with the lease provisions. No additional burden is placed on lessee, yet lessee is denied the windfall of interest free use of lessor's money. We recognize the lease provisions which place the burden on lessee to make royalty payments instead of shifting the burden to lessor's successors to fulfill an uncontemplated additional requirement (the presentation of a judgment of possession to lessee) as a prerequisite to the payment of royalties. This is not to be confused with the payment of royalties to the heirs which under the terms of lease paragraph 9 requires that the heirs present a certified copy of the judgment of possession.
Under our interpretation of LSA-R.S. 47:2413(B) the State's interest in securing inheritance taxes is protected because royalties paid to the named lessor become succession property which is deemed to be in the succession representative's possession. LSA-C.C.P. Art. 3211. Succession of Lambright v. Lambright, 252 So.2d 349 (La.App. 3 Cir. 1971). To get possession of the royalties, the heirs and legatees must pay inheritance taxes before they can obtain a judgment of possession. LSA-C.C.P. Art. 3381. If, as in the instant case, the succession is not placed under administration, the heirs must nevertheless secure a judgment of possession before they can take possession of the royalty checks made payable to the named lessor. LSA-C.C.P. Art. 3061.
Although LSA-R.S. 9:1516 was enacted too late to be relevant to this case, its language is apposite. It provides:

"§ 1516. Transfer or payment of monetary proceeds of minerals or mineral products, rentals, accrued royalties, and other funds related to minerals or *711 mineral contracts belonging or payable to deceased person; authority; discharge of holder

A. Upon proper authority any holder of monetary proceeds of minerals or mineral products, rentals, accrued royalties or other funds related to minerals or mineral products, belonging or payable to a deceased person, under the terms of a mineral lease or other contract, by operation of law or otherwise, may transfer or pay the same to the decedent's succession representatives, heirs, or the legal representatives of the heirs. The letters of the succession representative or the judgment recognizing and putting the heirs in possession, issued by a Louisiana court of competent jurisdiction, and accompanied by letters of tutorship or curatorship of the heirs who are not sui juris, shall constitute proper authority for making the transfer or payment which when so made shall be full protection to the holder. Conclusive proof to the holder of the letters or judgment and of the jurisdiction of the court rendering them shall result from copies thereof, duly certified.
B. Nothing contained in this section shall be construed as limiting the rights of a holder in making any transfer or payment under the terms and provisions of a mineral lease or other contract, or under existing law.
C. The term "holder" as used in this section means any natural person, corporation, association, partnership, receiver, tutor, curator, executor, administrator, fiduciary, or representative of any kind, in possession of the monetary proceeds of minerals or mineral products, rentals, accrued royalties or other funds related to minerals or mineral contracts, belonging or payable to a deceased person.
D. All laws or parts of laws in conflict herewith are hereby repealed. It is expressly provided however, that R.S. 30:105 through 108 shall not be repealed by the provisions of this section, nor shall this section be construed as altering or affecting the provisions of R.S. 47:2413." Acts 1970, No. 153, § 1.
Sub-paragraph B gives legislative approval to the provision found in paragraph 9 of the Hibbert-Anderson mineral lease. Sub-paragraph D states that the statute shall not be construed as altering or affecting the provisions of LSA-R.S. 47:2413. Would the legislature approve the payment of royalties to a deceased named lessor as it does in LSA-R.S. 9:1516(B) in one breath, and in another prohibit their release as Hibbert interprets LSA-R.S. 47:2413(B) to do? We think not. If Hibbert's contention is correct, then LSA-R.S. 9:1516(B) would not have been enacted.
The construction which we have applied gives effect to both legislative enactments and is required by the terms of the lease contract.
Hibbert next contends that his failure to pay production royalties to the named lessor did not violate LSA-R.S. 30:105. Hibbert has never disputed Edna Mudd Anderson's title to the leased land. He argues in this application (and still does not attack Edna Mudd Anderson's title) that the statute does not here apply because: (1) Edna Mudd Anderson did not hold under an instrument sufficient in terms to transfer title, and (2) she was not a party holding an interest in the minerals or under the lease. We find no merit in either contention.
Hibbert's application states that Mrs. Anderson ". . . acquired the property by inheritance as evidenced by a judgment of possession." He contends that a ". . . judgment of possession is declaratory, but not translative, of title. Everett v. Clayton, 211 La. 211, 29 So.2d 769 (1947)." If these were the only facts, there might be merit to the argument. But Mrs. Anderson acquired this property as a particular legacy by last will and testament from her deceased husband. Tr. Vol. II, p. 22. The property bequeathed was her *712 husband's separate property. Tr. Vol. II. p. 22. A particular legacy, unlike a universal legacy or an inheritance by intestacy which are not translative of title since the universal legatee or the heir merely continues the possession of its author, can be translative of title. LSA-C.C. Art. 3485; Sides v. Nettles, 4 Rob. 170 (La. 1843); Moore v. Blanc, 12 La.Ann. 7 (1857); Howell v. Noah, 6 La.App. 538 (La.App. 2 Cir. 1926); 1 Planiol, Civil Law Treatise, no. 2660 (La.St.L.Inst. transl. 1959); 28 Baudry-Lacantinerie & Tisser, Prescription, no. 657 (4th ed. 1924, La.St.L.Inst. transl. 1972); Comment, 15 Tul.L.Rev. 442 (1941).
The second contention is that Mrs. Anderson was not a party holding an interest in the minerals or under the lease. Although not alive, Mrs. Anderson was a party under the lease, and according to the provision of paragraph 9 Hibbert was required to continue paying royalties to her as the last record owner.
Hibbert's final argument on this issue is that LSA-R.S. 47:2413(B) conflicts with our construction of LSA-R.S. 30:105. This is again answered by the fact that LSA-R.S. 47:2413(B) does not prohibit the release of funds or property; it prohibits delivery of such funds to heirs or legatees of the deceased person absent a judgment of possession.
Although Hibbert violated LSA-R.S. 30:105 as we have demonstrated, both the trial court and appellate court decisions to cancel the lease were bottomed on the finding that Hibbert violated the lease provision requiring payment of production royalties, and the jurisprudential rule that such a violation, when unjustified, will result in lease cancellation. Violation of LSA-R.S. 30:105 was a contributing factor but was of secondary importance. See Pierce v. Atlantic Refining Company, La. App., 140 So.2d 19, which does not refer to LSA-R.S. 30:105. Consequently even if LSA-R.S. 30:105 did not apply, the cited jurisprudence requires that the lease be cancelled.
Hibbert argues that we erred in cancelling the entire lease. This is premised on his appreciation of the meaning of Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956). Hibbert reads Melancon to mean: ". . . the so called `forfeiture' provision permits lessee to retain unitized acreage in suits for cancellation based on delays in payment of royalties when there are bona fide disputesfor example, when the dispute turns on the question of who is entitled to receive royalties, or the amount due each." This interpretation is inadequate.
We understand Melancon to mean that when there is a bona fide dispute as to which there is real disagreement in good faith between the parties over undetermined matters, then it must first be judicially determined that lessee has failed to perform and discharge its obligations under the lease, after which lessee must be given a reasonable opportunity to prevent forfeiture by performing and discharging its obligations. However, lessee's failure to perform an undisputed obligation under the lease will result in a final judgment, including lease cancellation with no retention by lessee of unitized acreage if so ruled by the court, without the necessity of first allowing lessee a reasonable opportunity to avoid forfeiture.
The forfeiture clauses in Melancon and in paragraphs 3 and 11 in the Anderson lease are essentially the same, and consequently the forfeiture decreed by the Supreme Court in Melancon is to be here followed.
Hibbert contends that he is entitled to retain unitized acreage because there was a bona fide dispute sufficient in law to permit retention of unit acreage under the forfeiture provisions as interpreted in Melancon. Applying Melancon, we determined that in order for Hibbert to be allowed to retain unitized acreage, the bona *713 fide dispute would have to exist between Hibbert and Mrs. Anderson. Since there was no dispute concerning Mrs. Anderson's title, Hibbert was required to promptly and timely pay royalties. The title problems which constituted Hibbert's bona fide dispute concerned the Mudd-Sinclair Group, not Mrs. Anderson. Hibbert was required to pay royalties to Mrs. Anderson, the named lessor under paragraph 9 of the lease. When she granted the lease, she became the last record owner. Hibbert did not dispute her title. His disputes with the Mudd-Sinclair Group were irrelevant. By failing to perform his undisputed obligation under the lease, Hibbert was not entitled under the Melancon holding to retain unitized acreage.
We mentioned that Hibbert did not learn of a title dispute until September 10, 1962 to illustrate that Hibbert's argument (that he was entitled to retain the unitized acreage because of his dispute with the Mudd-Sinclair Group) was off point inasmuch as the basis of the cancellation was his failure to pay royalties to the named lessor. These royalty payments were long overdue before Hibbert learned of the title dispute. We therefore reject the argument that ignorance of these facts is immaterial under settled authority to the effect that ignorance of facts warranting or excusing nonperformance under a contract does not affect the right to assert such facts after they are discovered.
Hibbert was not justified, as that term has been defined in the jurisprudence, in his failure to pay royalties to the named lessor as was required by the express terms of the lease. We were however mindful of the harsh effect of lease cancellation. We therefore searched for mitigating factors which would persuade us that Hibbert acted in utmost good faith (as he is required to do) in performing his obligations to lessor under the lease. We found none. The withholding was not the result of a necessary delay in order to have surveys approved by the Department of Conservation as in Fawvor v. U. S. Oil Company, 162 So.2d 602 (La.App. 3 Cir. 1964). There was no bona fide dispute with respect to the effect of a forced unit on a previously established declared unit as in Bonsall v. Humble Oil & Refining Company, 201 F. Supp. 516, aff. 300 F.2d 150 (5th Cir. 1962). There was no problem with curative work on a title as in Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La. App. 3 Cir. 1964). There was no problem with prescription of mineral rights as in Mire v. Hawkins, 177 So.2d 795 (La.App. 3 Cir. 1965).
When questioned about what he would have done with the accumulated and accumulating royalties had the succession not been opened, Hibbert explained that he would follow the law as to that technicality. Despite his years of experience as an oil field operator and his care in seeking professional legal opinions, his actions after allegedly learning of Mrs. Anderson's death leave one with the impression that the best that could be said of his actions was that they were recklessly cavalier. So far as this record discloses, Hibbert did not seek advice concerning his obligations to the lessor. He simply enjoyed the fruits of his personal interpretation of the lease. To the contention that this was only an honest mistake by a layman, we reiterate that Hibbert was far from "layman" status as an oil field developer. We cannot ignore the serious implications of his failure to perform according to the terms of his lease. The "substantial rights in property" lessor holds under a lease are no less important and no less deserving of the same good faith care in treatment as those of lessee.
The application for rehearing is denied.
CULPEPPER, J., dissents and votes for a rehearing.
NOTES
[1] Many of the facts stipulated on remand are therefore irrelevant.
[2] The claimants referred to in our 1966 opinion as the "Sinclair-Birrat" group sold their interest in the property to William Mudd, a member of the Mudd-Sinclair group and did not appeal.
[3] Sec. 105. Withholding payment of rentals or royalties, when unlawful.

It shall be unlawful for a person acquiring mineral rights from, or mineral rights under a lease by, the last record owner and holding under an instrument sufficient in terms to transfer title or for a person purchasing mineral products to withhold payment of any rentals, royalties or other sums due to a party holding an interest in the minerals, or under the lease.
Sec. 106. Right to revenues pending test of title; effect of recorded lease.
A. A person producing minerals under a lease granted by the last record owner and holding under an instrument sufficient in terms to transfer title to the land or mineral rights, shall be presumed to have derived his right from the true owner. The lessor, royalty owner, lessee or producer or persons holding from them shall be entitled to all minerals produced or to their proceeds, unless and until a suit testing title of the land or mineral rights embraced in the lease is filed in the district court of the parish in which the property is located.
B. A purchaser of minerals produced from a recorded lease granted under these conditions shall be fully protected in making payment to any party in interest under the lease unless and until the above mentioned suit should be filed and the purchaser receives notification of it by the usual postal registry receipt card. The purchaser shall not be entitled to this protection unless he has recorded in the conveyance records of the parish in which the land is located, notice that the minerals have been and will be bought by him.
[4] "If a lessee, having been given written notice demanding cancellation of the lease, fails or refuses to comply within ten days, he shall be liable to the lessor for a reasonable attorney's fee incurred by the lessor in bringing suit to have the cancellation adjudged."
[1] "Hibbert, the lessee, under (paragraph 9 of) the lease from Edna Mudd Anderson would have been protected had he made payments to the estate of Edna Mudd Anderson ....

Accordingly, under the provisions of the lease from Edna Mudd Anderson to R. E. Hibbert providing for cancellation of the same for failure to pay royalties and in keeping with the rulings of the Court of Appeal in Pierce versus Atlantic Refining Company, 140 So.2d 19, and the authorities cited therein, the Court herein finds that the failure to pay royalties to Edna Mudd Anderson or to her account amounted to an active breach of the lease and serves as a basis for its cancellation." Tr. Vol. II, pp. 72, 73. (Emphasis added.)
[2] "§ 2413. Certain acts prohibited prior to payment of tax

* * * * *
B. Giving of possession by banks, depositories, or other custodians. Unless the tax due under this Part has been paid, or unless it is determined judicially in the manner prescribed herein that no tax is due: (1) no bank, banker, trust company, warehouseman, depository, or other person having on deposit, or having possession or control of, any money, credits, goods, or other things or rights of value which belonged to a deceased person, or in which the latter had an interest, shall deliver any such money or property to any heirs or legatees of the deceased person; and (2) no corporation shall transfer to any heirs or legatees of a deceased person any stock or registered bonds of such corporation which were owned by the deceased person. Except as provided hereinafter, any person or corporation so making delivery or transfer shall be liable for the tax.
A person or corporation may deliver or transfer money or property which belonged to a deceased person, without incurring any liability for the tax due under this Part, to: (1) the succession representative of the deceased who submits a certified copy of the letters issued to him by a court of competent jurisdiction; or (2) the surviving spouse, heirs, or legatees of the deceased who submit a certified copy of the judgment of possession rendered by a court of competent jurisdiction which evidences their right to the possession of the money or property so delivered or transferred. A certified copy of such a judgment of possession constitutes full proof of the payment of all taxes due under this Part, or that no such tax is due. Nothing contained herein shall be construed to repeal, modify, or affect R.S. 9:1513 or those provisions of R.S. 6:66 which provide that a copy of the letters issued to a succession representative, or of a judgment of possession, certified by the clerk of the court which issued or rendered it, is conclusive proof to a bank of the jurisdiction of such court.
No bank or other depository having in its possession a safe deposit box or any property, enterable by or deliverable to one or more persons, upon receipt of knowledge of the death of any such persons, shall permit entry thereunto or delivery thereof until after three days' written notice to the inheritance tax collector of the parish in which the property is situated, or receipt of his written consent thereto. As amended Acts 1960, No. 35, § 1."